**The STATE of Ohio, Appellee,**

v.

**STRICKLAND, Appellant.**

[Cite as *State v. Strickland,* 183 Ohio App.3d 602, 2009-Ohio-3906.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 91982.

Decided Aug. 6, 2009.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Scott Zarzycki, Assistant Prosecuting Attorney, for appellee.

James L. Burdon, for appellant.

---

COLLEEN CONWAY COONEY, Administrative Judge.

{¶ 1} Defendant-appellant, Christian Strickland, appeals his convictions. Finding no merit to the appeal, we affirm.

{¶ 2} In August 2007, Strickland was charged with two counts of rape, two counts of attempted rape, one count of felonious assault, and one count of attempted felonious assault. He was also charged with kidnapping, which carried a sexual-motivation specification. The matter proceeded to a bench trial, at which the following evidence was adduced.

{¶ 3} In February 2007, Strickland and B.F. met through an Internet dating service. They began dating in March 2007, and their relationship quickly became intimate. Throughout their relationship, B.F. and Strickland fought because of her suspicions that Strickland was "unfaithful" to her. B.F. repeatedly ended the relationship, then forgave him, and they would get back together again.

{¶ 4} In June 2007, they became engaged, but B.F. broke off the engagement on July 15, 2007. Subsequently, she requested that Strickland remove his belongings from her home. When he came to pick up his belongings, the two reconciled, and Strickland gave her the password to his e-mail account to reassure her that he was not unfaithful. While she was checking his e-mail account, B.F. discovered 46 deleted e-mails to "the other women." This prompted her to end the relationship again. During the following week, Strickland contacted B.F. and came to her home. He threatened to kill her and himself. She became afraid of his threats and had the locks on her doors changed. On July 29, 2007, Strickland was waiting for her at her home, and the two talked about their relationship and Strickland's infidelities. They engaged in sexual intercourse that night and again the next morning.

{¶ 5} On the evening of July 30, 2007, Strickland met B.F. at her house after work. The evening began with normal conversation and progressed in the usual manner. She testified that while they were outside on her patio, they began to argue about Strickland's infidelities. At one point, Strickland grabbed her face as if to kiss her and bit her lip. A short while later, he flipped over the patio chair she was sitting on, held her in the grass, and choked her with both hands, threatening to kill her and then himself. He eventually let her go, apologized profusely, and assisted her into the kitchen, where they continued to argue.

{¶ 6} While inside, B.F. discovered that Strickland had taken her car keys and her cell phone. He then walked her around the house to lock all the windows. He also put two chairs together in the kitchen to impede access to the patio door. B.F. eventually convinced him to go to sleep, hoping that he would fall asleep first so she could take the spare car key in her bedroom and leave.

{¶ 7} B.F. testified that the arguing continued in the bedroom, and Strickland told her, "[W]e're going to be together one last time," and "[Y]ou can call it rape but you're going to enjoy it." He then attempted intercourse with her, but he was unable to perform. He also tried to force her to perform oral sex on him, but she refused. Strickland then became frustrated and bit her on the thigh.

{¶ 8} After more talking and crying, B.F. fell asleep. She later woke up, unable to breathe because Strickland was on top of her. She testified that later in the night, he told her again that they were going to be together one last time and forced her to have vaginal intercourse with him. He then insisted that she have an orgasm and forcibly penetrated her with his fingers. She also testified that Strickland's violent behavior continued through the night as he repeatedly smothered her with a pillow.

{¶ 9} In the morning, B.F. tried to convince Strickland to call the police. Eventually, he let her outside to smoke. When he turned his back, she began to run away. Strickland then said, "[F]ine, fine. I'll call the police. I'll call the police." She heard him talking to someone, so she ran to the phone and started screaming her address. She then ran toward the driveway and observed the police approaching her home.

{¶ 10} Strickland testified in his own defense. He admitted that many of B.F.'s suspicions of unfaithfulness were true. He also testified that he was at B.F.'s house the night before the incident and had consensual intercourse that night and the morning of July 30, 2007. On the night of the incident, however, he claimed that the evening progressed in its usual manner. The arguments did not begin until she accused him of lying and "cheating on her." He testified that the sexual intercourse and digital penetration were consensual and that he took her car keys because she had been drinking too much.

{¶ 11} He denied raping, kidnapping, and assaulting B.F. He testified that the only physical altercation between them consisted of "wrestling" in the backyard for his cell phone, her smacking him in the kitchen, and her attempt to strike him when they were in the garage. He stated that he called the police the next morning because B.F.'s behavior was very bizarre and he had an "eerie feeling."

{¶ 12} The trial court found him guilty of two counts of rape and two counts of attempted rape, attempted felonious assault, and kidnapping, with the sexual-motivation specification attached. The trial court found him not guilty of

felonious assault. Strickland was sentenced to four years in prison on each rape and attempted-rape count, one year in prison on the attempted-felonious-assault count, and three years in prison for kidnapping. The trial court ordered that the rape counts be served concurrently with each other, but consecutively to the attempted-rape counts, which were also ordered to be served concurrently with each other. The attempted-felonious-assault and kidnapping counts were ordered to be served concurrently with all other counts, for an aggregate term of eight years in prison.

{¶ 13} Strickland now appeals, raising three assignments of error for our review.

### Jury Waiver

{¶ 14} In the first assignment of error, Strickland argues that he was denied his constitutional right to a jury trial because there is no evidence that his jury waiver was signed in open court.

{¶ 15} Under Crim.R. 23(A), a defendant may knowingly, intelligently, and voluntarily waive in writing his right to trial by jury. The jury waiver "shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof." R.C. 2945.05.

{¶ 16} In *State v. Lomax,* 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 9, the Ohio Supreme Court held that "to be valid, a waiver must meet five conditions. It must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." The *Lomax* court stated:

> We do not mandate magic words, or a prolonged colloquy, but simply what Ohio law intends—that a defendant while in the courtroom and in the presence of counsel, if any, acknowledge to the trial court that the defendant wishes to waive the right to a jury trial.

Id. at 356, 872 N.E.2d 279.

{¶ 17} Strickland claims that there is no evidence in the transcript that he personally signed the waiver. He bases his arguments on *State v. Pless* (1996), 74 Ohio St.3d 333, 658 N.E.2d 766, in which the Ohio Supreme Court held that a trial court lacks jurisdiction to try a defendant without a jury absent strict compliance with the jury-waiver requirements of R.C. 2945.05.

{¶ 18} However, it is not necessary that the written waiver be signed in open court to be valid. *State v. Ford,* Cuyahoga App. Nos. 79441 and 79442, 2002-Ohio-1100, 2002 WL 407925, citing *State v. Walker* (1993), 90 Ohio App.3d 352, 358, 629 N.E.2d 471. A valid waiver of the right to a jury trial is accomplished by completion of the process set forth in R.C. 2945.05 and reinforced by Crim.R. 23(A).

{¶ 19} "First, a defendant must sign a written statement affirming that he is knowingly and voluntarily waiving his constitutional right to a trial by jury, uninfluenced by promises or threats of any kind. Additionally, there must occur, in open court, a colloquy between the trial judge and the defendant himself, extensive enough for the judge to make a reasonable determination that the defendant has been advised and is aware of the implications of voluntarily relinquishing a constitutional right." Id.

{¶ 20} Thus, as long as the signed writing has been made a part of the record and the waiver is reaffirmed in open court, the procedural requirements of R.C. 2945.05 and Crim.R. 23(A) are satisfied. Id. See also *State v. Thomas,* Cuyahoga App. No. 82130, 2003-Ohio-6157, 2003 WL 22724619.

{¶ 21} In the instant case, a review of the record reveals that the trial judge read the entire jury-waiver form to Strickland and determined that his waiver was knowingly, intelligently, and voluntarily made. It is clear from the following exchange that it was Strickland's intention to waive his right to a jury trial:

THE COURT: The form reads: Defendant's Waiver of Jury Trial. I, Christian Strickland, the defendant in this cause, hereby voluntarily waive and relinquish my right to a trial by jury and elect to be tried by a judge of this Court of Common Pleas.

Mr. Strickland, is that what you want to do?

STRICKLAND: Yes.

{¶ 22} In addition, the written jury waiver was made a part of the record. It bears Strickland's signature, which is attested to by defense counsel. Moreover, neither Strickland nor defense counsel objected to the commencement of trial or asserted at trial that Strickland had not signed the form. Thus, we find that the trial court complied with the requirements of R.C. 2945.05.

{¶ 23} Accordingly, the first assignment of error is overruled.

## Manifest Weight of the Evidence

{¶ 24} In the second assignment of error, Strickland argues that his convictions are against the manifest weight of the evidence.

{¶ 25} In evaluating a challenge to the verdict based on the manifest weight of the evidence in a bench trial, "the trial court assumes the fact-finding function of the jury. Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court

clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 16, citing *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541.

{¶ 26} As the *Thompkins* court declared:

Weight of the evidence concerns "the inclination of the greater amount of credible evidence offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.

Id., quoting Black's Law Dictionary (6th Ed.1990), 1594.

{¶ 27} A reviewing court must be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Moreover, in reviewing a claim that a conviction is against the manifest weight of the evidence, the conviction cannot be reversed unless it is obvious that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. McShane*, Cuyahoga App. No. 91367, 2009-Ohio-3455, 2009 WL 2054314, citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶ 28} Strickland argues that B.F.'s testimony lacked credibility. He claims that the evidence in this case portrays her as "a woman obsessed by her jealousy and unrestrained by the oath she took to tell the truth." He maintains that her credibility was further tarnished by the lack of physical evidence to corroborate her accusations and the conflicts in her testimony.

{¶ 29} But a review of the record reveals that B.F.'s testimony regarding the incident is corroborated by other evidence. She testified that the first physical attack of the evening was when they were outside and Strickland grabbed her face as if to kiss her and bit her lip. He also flipped her chair over, causing her to land on the grass, and then choked her. Detective James Lobenthal of the

Brecksville police testified that while he was taking B.F.'s statement, he observed that her lip was swollen. Strickland admitted the incident on the grass, but claimed that it merely involved wrestling over his cell phone.

{¶ 30} B.F. also claimed that Strickland put two chairs together in the kitchen to impede her access to the patio door. Lobenthal testified that he observed two chairs in B.F.'s kitchen that were back to back, which could have prohibited access to the patio door. He also described the condition of her bedroom as in disarray. B.F. further testified that Strickland took her car keys and her cell phone. Strickland admitted taking her car keys, claiming that she was too drunk to drive.

{¶ 31} B.F. testified that when they were in the bedroom, Strickland told her, "[W]e're going to be together one last time," and "[Y]ou can call it rape but you're going to enjoy it." On cross-examination, Strickland admitted that he suggested that they have sex and said, "[S]he [B.F.] said no, but—[w]e both knew that wasn't the case."

{¶ 32} B.F. claimed that Strickland attempted to force her to engage in sexual intercourse and oral sex, but Strickland could not perform, so he bit her thigh. Both Lobenthal and the sexual-assault nurse examination ("SANE") at Marymount Hospital noted that there was bruising and what appeared to be a bite mark on B.F.'s thigh.

{¶ 33} B.F. also testified that Strickland forced her to have vaginal intercourse and digitally penetrated her. She also claimed that he smothered or choked her several times throughout the night. Lobenthal testified that he observed swelling and bruising under her left eye and moderate redness around her neck. Furthermore, the nurse performing the SANE examination testified that B.F.'s left eye was swollen and that B.F. complained of neck pain.

{¶ 34} As the trier of fact in the instant case, the trial court is free to accept or reject all or any part of the testimony of the witnesses and assess the credibility of those witnesses. *State v. Anderson*, Cuyahoga App. No. 90460, 2008-Ohio-4240, 2008 WL 3870696. Although both parties could be found to lack credibility in that their testimony conflicts considerably, the trial court weighed all evidence and reasonable inferences and found B.F. to be a more credible witness. Thus, we find that the trial court did not lose its way, and Strickland's convictions are not against the manifest weight of the evidence.

{¶ 35} Accordingly, the second assignment of error is overruled.

### Subpoenas

{¶ 36} In the third assignment of error, Strickland argues that his constitutional right to a fair trial was denied when the trial court quashed subpoenas he issued for B.F.'s computer records.

{¶ 37} This court reviews a trial court's ruling on a motion to quash a subpoena for an abuse of discretion. *State ex rel. The V Cos. v. Marshall* (1998), 81 Ohio St.3d 467, 692 N.E.2d 198. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140, quoting *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 38} In the instant case, the trial court held a hearing on the subpoenas issued by Strickland and the motions to quash the subpoenas filed by B.F. and her employer. Strickland claims that B.F. had personal knowledge of his e-mail user name and password and was sending unauthorized e-mails from his account. Thus, he argues that the court abused its discretion when it refused to allow him the opportunity to examine these records.

{¶ 39} However, a review of the record reveals that the parties stipulated that the defense would have access to B.F.'s work and home computers, various Internet providers she used, her cell phone records, and records from the Internet dating service. With regard to her work computer, the trial court limited access to mirror images of her employer's server because of attorney/client-privilege concerns.[1] The court ordered all communications from her work computer referring to Strickland or this case to be turned over, including any e-mails sent using her e-mail account or Strickland's e-mail account. Thus, we cannot say that the trial court abused its discretion in granting the motions to quash the subpoenas.

{¶ 40} Accordingly, the third assignment of error is overruled.

Judgment affirmed.

ROCCO, J., concurs.

KILBANE, J., dissents.

MARY EILEEN KILBANE, Judge, dissenting.

{¶ 41} I respectfully dissent from the majority's decision that concluded that the trial court complied with R.C. 2945.05 when it accepted appellant's jury waiver. For the following reasons, I would reverse and remand for a new trial.

{¶ 42} R.C. 2945.05 provides that a defendant may elect to waive his right to be tried by a jury at any time prior to the commencement of trial. In order for the waiver to be valid, it must be in writing, signed by the defendant, filed, made part

---

1. B.F. is an attorney employed by a law firm.

of the record, and made in open court. *Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 9.

{¶ 43} The Ohio Supreme Court has previously held that a trial court lacks jurisdiction to try a defendant when the trial court has failed to strictly comply with R.C. 2945.05. *Pless*, 74 Ohio St.3d at 337, 658 N.E.2d 766, citing *State v. Tate* (1979), 59 Ohio St.2d 50, 13 O.O.3d 36, 391 N.E.2d 738. Appellant argues that the trial court did not comply with the requirement that the waiver be made in open court; specifically, that the appellant's signature be made or acknowledged in open court.

{¶ 44} In the instant case, the jury-waiver form was signed outside the presence of the trial court. Although it is not required that a defendant sign the waiver in open court, if he does not, the court must verify that it is the defendant's signature on the written waiver. *State v. Corbin*, Cuyahoga App. No. 82266, 2004-Ohio-2847, 2004 WL 1221670, ¶ 24.

{¶ 45} The trial court read the jury waiver to appellant and explained to him the specific rights he was giving up by waiving his right to a jury trial. However, the trial court never specifically verified that it was, in fact, appellant's signature on the written waiver form. I disagree with the majority's assertion that the defense counsel attested to appellant's signature. A review of the transcript reveals that defense counsel attested to his own signature on the written waiver, but never verified appellant's signature. The trial court never inquired as to appellant's signature.

{¶ 46} While this court has previously stated that there is no specific language the trial court must use when questioning the defendant regarding his jury waiver, we have never held that the signature on the written waiver does not require verification. *Thomas*, 2003-Ohio-6157, 2003 WL 22724619, at ¶ 14, citing *State v. Huber*, Cuyahoga App. No. 80616, 2002-Ohio-5839, 2002 WL 31401616.

{¶ 47} In *Corbin*, 2004-Ohio-2847, 2004 WL 1221670, this court specifically stated, "R.C. 2945.05 does not require a defendant to complete the act of signing the waiver in open court; the waiver is valid if the defendant acknowledges his signature and expresses his understanding of the waiver." *Corbin* at ¶ 24, citing *State v. Franklin*, Cuyahoga App. No. 81426, 2003-Ohio-2649, 2003 WL 21193014, at ¶ 12–13; see also *State v. Campbell*, Cuyahoga App. No. 83489, 2004-Ohio-4090, 2004 WL 1752978, at ¶ 9.

{¶ 48} In this case, although appellant indicated to the trial court that he understood the waiver, the trial court never verified that the signature on the written waiver was, in fact, executed by appellant. Therefore, I would reverse on the first assignment of error and remand for a new trial.