[Cite as *State v. Hundley*, 2018-Ohio-3566.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 106235

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CHARLES C. HUNDLEY

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-612938-A

**BEFORE:** Laster Mays, J., S. Gallagher, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** September 6, 2018

-i-

**ATTORNEYS FOR APPELLANT**

Mark A. Stanton
Cuyahoga County Public Defender

By: Frank Cavallo
Assistant Public Defender
310 Lakeside Avenue, Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Jeffrey Schnatter
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

{¶1} Defendant-appellant Charles C. Hundley ("Hundley") appeals his convictions. For the reasons set forth below, we affirm.

{¶2} This case arises from the shooting death of Gregory Clark ("G. Clark") on January 1, 2017. On January 20, 2017, the Cuyahoga County Grand Jury charged Hundley with:

Count 1: Murder, R.C. 2903.02(A), an unclassified felony, with one- and three-year firearm specifications;

Count 2: Murder, a violation of R.C. 2903.02(B), an unclassified felony, with one- and three-year firearm specifications;

Count 3: Felonious assault, a violation of R.C. 2903.11(A)(1) and (2), a second-degree felony with one- and three- year firearm specifications;

Count 4: Felonious assault, a violation of R.C. 2903.11(A)(1) and (2), a second-degree felony, with one- and three- year firearm specifications;

Count 5: Involuntary manslaughter, a violation of R.C. 2903.04(A), a first-degree felony, with one- and three-year firearm specifications;

Count 6: Having a weapon while under disability, a violation of R.C. 2923.13(A)(2), a third-degree felony; and

Count 7: Receiving stolen property (firearm), a violation of R.C. 2913.51(A), a fourth-degree felony.

Counts 1-5 also carried repeat violent offender and notice of prior conviction specifications. At the time of the indictment, Hundley was on probation for attempted failure to register a notice of change of address under R.C. 2950.05(E)(1).[1]

{¶3} Hundley was arraigned on January 25, 2017 and pled not guilty to the indictment. A bench trial began on June 28, 2017. Count 7 was dismissed under Crim.R. 29. Hundley was found guilty on July 25, 2017, of the remaining counts. On August 15, 2017, Hundley received a life sentence with parole eligibility after 20 years.

## I.    Trial

{¶4}     Testimony established that on December 31, 2016, Deonte Dudley ("Dudley") and Dudley's girlfriend Kelasha Bedell ("Bedell") hosted a party at their home in Maple Heights, Ohio. A number of the couple's friends and family members were present. Hundley, Dudley's stepbrother, arrived at the party with his girlfriend Shakira Jones, her daughter Sequoia Jones, and the daughter's boyfriend William Taylor ("Taylor"). At midnight, a number of individuals were shooting guns outside. An hour or two later, a group of attendees were in the basement dancing, talking, and drinking when an altercation occurred, culminating in the shooting death of G. Clark, the brother of Bedell.

---

[1]    *State v. Hundley*, Cuyahoga C.P. No. CR-14-587859-A.

### A. State's Case

{¶5} The state presented 17 witnesses. Bedell's daughter, 11-year-old D.G., was in the basement and heard her uncle Marion Clark ("M. Clark") speak to Taylor about dancing too closely with one of D.G.'s minor cousins, M.K. Taylor responded by pushing M. Clark. Hundley and others restrained the parties. D.G. pulled Hundley away from M. Clark as D.G.'s mother, Bedell, and uncle G. Clark entered the basement.

{¶6} Bedell, Dudley, and G. Clark were trying to separate M. Clark and Taylor when Hundley pulled a 9 mm Smith & Wesson gun from his waistband and fired at the center of the group. D.G. saw G. Clark drop to the floor. She and the other children ran to the second floor bedroom area until police arrived. D.G.'s 14-year-old cousin S.D. also observed Hundley shoot G. Clark and confirmed D.G.'s testimony.

{¶7} Hundley's brother Dudley testified that Taylor pushed M. Clark. Dudley was standing between them when Bedell and G. Clark ran downstairs. Dudley heard a shot and saw G. Clark lying on the floor. He did not see Hundley's involvement with the altercation or see Hundley with a gun that night.

{¶8} Bedell heard a commotion and ran to the basement followed by G. Clark to find Dudley separating M. Clark and Taylor. She saw Hundley standing near the children when he "stepped back," pulled out a gun, and fired "for no reason at all," striking G. Clark in the head. (Tr. 378.)

{¶9}   Bedell pushed her eight-year-old into the adjacent room and returned to see the gun either on the couch or floor.   She slid the gun under the couch so that nobody else would get hurt and later informed police of the location of the firearm.

{¶10}   Sergeant Matthew Berger ("Sgt. Berger") with the Maple Heights Police Department interviewed witnesses at the scene. Hundley told Sgt. Berger that he was in the kitchen when the shot was fired. After interviewing D.G. and other minors who were present during the shooting,   Sgt. Berger questioned Hundley again.   This time Hundley said that he went to the basement because his brother was fighting with another male and did not mention hearing a shot.

{¶11}   Detective Thomas Halley ("Det. Halley") and Detective Andrew Sperie ("Det. Sperie") with the Maple Heights Police Department ("MHPD") responded to the scene.   Multiple shell casings were located around the property including several 9 mm Hornady brand casings.   Det. Sperie found the Smith & Wesson under the couch with the assistance of Bedell, along with a brass shell casing.

{¶12}   While police were questioning the adults on the lower levels of the home, D.G. informed the police that an adult male with a gun was hiding on the second floor.   The male was identified as Jeffrey Jefferson ("Jefferson"), a friend of Hundley. A black .38 caliber revolver was hidden under a towel in one of the children's bedrooms.

{¶13} Forensic examinations of the black revolver, Smith & Wesson, Smith & Wesson magazine and bullet casings were conducted.   The DNA samples provided for analysis included DNA from Hundley and Jefferson.   Due to the mixtures of DNA

profiles on the firearms, the DNA results were inconclusive. A sample from the blood stain on the basement floor was sourced solely to G. Clark as well as a sample from the lower grip of the Smith & Wesson.

{¶14} The Smith & Wesson weapon was determined to be operable. The 9 mm Hornady brand cartridge casing recovered from the basement floor, as well as several casings recovered outside of the house, were fired from the Smith & Wesson; however, the forensic examination did not absolutely confirm that the bullet that killed G. Clark was fired from the Smith & Wesson.

{¶15} Joseph Felo, D.O. ("Dr. Felo"), chief deputy medical examiner for the Cuyahoga County Coroner's Office, testified that the bullet entered the left frontal scalp of G. Clark. Two large and two small fragments of the jacketed bullet were recovered from his body. Based on the measurements of the fragments, the bullet appeared to be of medium caliber, such as a .38 caliber, .357 caliber or 9 mm.

**B.     Defense's Case**

{¶16}   The defense presented two witnesses.   Taylor testified that he accompanied Hundley to the party.   An hour or so after midnight, Taylor was in the basement talking with Hundley and several others.   M. Clark said something to Taylor and grabbed Taylor by the collar.   Taylor and M. Clark were restrained by the others including Hundley's brothers, Steven Goins ("Goins") and Dudley.

{¶17}   Taylor heard a gunshot and turned to see M. Clark holding a black revolver.   Taylor did not see Hundley holding a gun but identified the Smith & Wesson as the gun that Hundley carries.   Taylor did not wait for police to arrive because of a warrant for an outstanding probation violation.

{¶18}   Hundley also took the stand.   Hundley admitted that he and several others were shooting guns at midnight, and that he was shooting the Smith & Wesson containing the Hornady brand ammunition.   Hundley was proceeding  down the basement steps when he observed a "scuffle" between M. Clark and Dudley.   (Tr. 928.)

> Hundley:     I grabbed Marion [M. Clark] by the left pocket of his waist and tried to grab him around his head to pull him down. And I noticed my little brother on the steps, I'm yelling for him to pull [Marion's] legs so he can't stand up.  And when I'm doing this, I feel him juggling [sic] and he's reaching for my gun.  So I reached down with my left hand, pulled the gun up like this and I'm telling my brother [Deonte Dudley] to pull his legs.  By that time everybody's pushing and pulling and I'm into the wall and next thing I know I get struck and we hear a gunshot.

(Tr. 928.)

{¶19} Hundley stated that he was "struck" on his left hand during the scuffle. After the gunshot, Hundley was pushed from behind by an unknown person, and fell to the ground. He saw M. Clark approaching with a black revolver and they began scuffling with the gun when Bedell's brother Joseph Watson ("Watson") intervened. Hundley ran upstairs to the driveway but remained on the scene.

{¶20} During cross-examination, Hundley admitted that: (1) there was only one gunshot in the basement that night, (2) he owned and possessed the Smith & Wesson, (3) the weapon was loaded with Hornady brand bullets, and (4) the brass shell casing discovered at the scene was a Hornady brand casing. Hundley denied that the bullet that killed the victim came from his gun.

{¶21} Hundley offered that the gun may have discharged accidentally when he was struck in the hand during the scuffle. "I never pointed, aimed, or intended to shoot no one." (Tr. 960.) "[A] struggle was going on, I had the gun up in the air like this and I'm making sure that [Marion] don't flip me" "so the gun gets hit out of my hand and everybody was pushing and shoving." (Tr. 963.) Hundley was certain that M. Clark did not strike his hand. Hundley was examined upon his arrest and medically diagnosed with a contusion to his left thumb with no damage to the thumbnail.

{¶22} The trial court issued a verdict of guilty. Hundley appeals his convictions.

## II. Assignments of Error

{¶23} Hundley presents three assignments of error:

I. The trial court violated Hundley's right to remain silent under the Fifth Amendment to the United States Constitution and Article 1 Section 10 of the Ohio Constitution by permitting the state to reference Hundley's prearrest silence as substantive evidence of guilt.

II. The trial court erred by finding Hundley guilty against the manifest weight of the evidence.

III. Hundley was denied the effective assistance of counsel.

## III. Discussion

### A. Prearrest Silence

**{¶24}** *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), holds that the state may not seek to "draw an impermissible inference of guilt" from the silence of a defendant who is in custody." *State v. Cannon*, 8th Dist. Cuyahoga No. 100658, 2014-Ohio-4801, ¶ 11, citing *Doyle* at 611. "'*Miranda* warnings carry the state's 'implicit assurance' that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him.'" *Id.*, quoting *Wainwright v. Greenfield*, 474 U.S. 284, 290-291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

**{¶25}** The Fifth Amendment is not implicated where prearrest silence is involved because the state has not "'induce[d] a defendant to remain silent.'" *Id.* at ¶ 12, quoting *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). The same is true of voluntary statements given after *Miranda* rights are administered, and of post-arrest silence prior to a *Miranda* warning. *Id.*, citing *Fletcher* at 605-607 and *Anderson v. Charles*, 447 U.S. 404, 408-409, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

**{¶26}** Generally, a defendant's Fifth Amendment rights would be violated by allowing the state to use "pre-arrest silence in the state's case-in-chief [which] would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 31.

**{¶27}** Hundley asserts the following exchange violated his Fifth Amendment rights:

State:  You were encountered by several police officers that night on scene, you interacted with a couple of different officers, correct?

Hundley:  Just two that I remember.

State: Two, okay.  So the first one you were kind of standing with I believe [was] Horace King?

Hundley:  My father, my mother, my brother Steve.

State: Steve.  And at that point when the officers asked where were you guys when the shooting happened —

Hundley:  I didn't hear him say that.  I think my father and one of them, my father and my brother, one of them responded, said that they were in the kitchen.  I never responded because I didn't really hear the question.

State: Well, you had to have assumed what your father or mother or whoever you heard respond, right, you heard them respond, [i]n the kitchen?

Hundley:  He didn't directly ask me.

(Tr. 955-956.)

{¶28} Hundley moved for a mistrial, arguing that the state was attempting to use Hundley's prearrest silence as substantive evidence of Hundley's guilt. The state responded that Hundley was not under arrest and had not been *Mirandized* so no Fifth Amendment protections were implicated.

{¶29} The trial court denied Hundley's motion for a mistrial.

Court: Yeah. All he's asking, to my ear, [counsel], is did you hear the officer say to basically the group, [w]here were you? Part of the group said, we were such and such a place and his question, the essence of it, isn't it true that you heard one or more of your group say, [w]e were in the kitchen, and you didn't chime in to say, [w]ell, I wasn't in the kitchen, I was somewhere else.

(Tr. 956-957.)

{¶30} Hundley also challenges the use of prearrest statements during closing arguments.

State: * * * but there are all these police officers standing on scene, he never brings it to any of these officers['] attention, that, [h]ey, here's what happened, you need to talk to the guy in the glasses, because he was grabbing at me. You know the guy you have in the back seat of the police car who's acting out, you need to talk to him.

Counsel: I would object to any comments made of the failure of the defendant to actively make statements to the police. I think it goes, just what you said earlier, your Honor, of creating an issue, very severe issue.

And I understand there's no jury here. If there would have been a jury, my objection would have been much more forceful or much more intense, but I trust in the [c]ourt to

handle that, but I would ask the prosecutor to refrain. I'd ask the [c]ourt to remind the prosecutor that perhaps this is an improper place to build with statements, even though it's closing argument.

(Tr. 1011-1012.)

**{¶31}** The court ruled:

The Fifth Amendment prevents the government from compelling testimony. What [counsel for the state] is describing is a person who might, depending on one's view of the evidence, have reason to believe he's going to be suspected of a crime, who doesn't, on his own, come forward to inform the government that he shouldn't be suspected and here's why, so I don't think it's unfair as to argument.

(Tr. 1012.)

**{¶32}** We first point out that Hundley testified during the trial, and the testimony occurred during cross-examination and not the state's case-in-chief. *Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, 807 N.E.2d 335, ¶ 31. When a defendant testifies at trial, the defendant has "'cast aside his cloak of silence.'" *Id.* at ¶ 33, quoting *Jenkins v. Anderson,* 447 U.S. 231, 238, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). "Thus, use of prearrest silence as impeachment evidence is permitted because it furthers the truth-seeking process." *Id.* "[N]either the Fifth Amendment right to be free from self-incrimination nor the Fourteenth Amendment right to due process is violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Leach* at ¶ 21, citing *Jenkins* at 238, 240.

**{¶33}** We also note that "in a bench trial, the court is presumed to have considered only the relevant, material, and competent evidence." *State v. Willis*, 8th Dist. Cuyahoga No. 90956, 2008-Ohio-6156, ¶ 15, citing *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). Therefore, we may presume that the decision of the trial court was not impacted by the references. *Id*. at ¶ 16. The trial court's explanations in denying Hundley's objections and in granting Hundley's objections during closing arguments supports the presumption that the trial court afforded due consideration to Hundley's position.

**{¶34}** Finally, we observe that pursuant to Crim.R. 52(A), "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded" "as harmless."

> In order to find an error harmless, a reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *State v. Lytle*, 48 Ohio St.2d 391, 403, 358 N.E.2d 623 (1976). A reviewing court may overlook an error where the admissible evidence comprises "overwhelming" proof of a defendant's guilt. *State v. Williams*, 6 Ohio St.3d 281, 290, 452 N.E.2d 1323 (1983) . "Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *State v. Brown*, 65 Ohio St.3d 483, 485, 1992-Ohio-61, 605 N.E.2d 46.

*State v. Atkins-Boozer,* 8th Dist. Cuyahoga No. 84151, 2005-Ohio-2666, ¶ 13.

**{¶35}** Assuming arguendo that an error occurred, we do not find that the record supports that the allegedly "'unlawful testimony contributed to [Hundley's conviction].'" *Id*., citing *Brown* at 485.

**{¶36}** Hundley's first assigned error is without merit.

### B. Manifest Weight

**{¶37}** Hundley argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶38}** "'Weight is not a question of mathematics, but depends on its effect in inducing belief. *Black's* [*Law Dictionary*] 1594 [6th Ed.1990].'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

**{¶39}** The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. During a bench trial

> "'[T]he trial court assumes the fact-finding function of the jury. Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'"

*State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 25 (8th Dist.), quoting *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, ¶ 16 (8th Dist.).

**{¶40}** Hundley points to inconsistencies in the testimony of the witnesses in support of his manifest weight challenge. However, a number of witnesses personally observed Hundley point and fire the Smith & Wesson. D.G. testified that she was

standing with Hundley when he pulled the gun from his waistband and fired. S.D. and M.W. also witnessed the shooting. Bedell saw Hundley lift the gun and shoot G. Clark.

{¶41} M. Clark testified that Hundley's younger brother Goins knocked the gun from Hundley's hand after the shooting. Bedell's brother Watson heard a shot and saw Hundley holding the Smith & Wesson. He also saw Goins attempting to take the gun from Hundley.

{¶42} Hundley admitted that a single shot occurred in the basement and to possession of the Smith & Wesson containing Hornady ammunition. He also stated that he was holding the Smith & Wesson in the air during the struggle with M. Clark when an unknown individual struck his hand causing the weapon to fire.

{¶43} Dr. Felo testified that the bullet fragments removed from G. Clark appeared to be from a medium caliber weapon such as the 9 mm Smith & Wesson or .38 caliber black revolver discovered in the home. A Hornady shell casing matching the remaining ammunition located in the magazine of the Smith & Wesson was located on the basement floor near the body. A revolver does not eject bullet casings.

{¶44} "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24.

**{¶45}** We do not find that the finder of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, at ¶ 23-26, quoting *Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125, citing *Thompkins* at 390.

**{¶46}** The second assigned error lacks merit.

### C.      Ineffective Assistance of Counsel

**{¶47}** In order to substantiate a claim of ineffective assistance of counsel, Hundley must show that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶48}** Judicial scrutiny of defense counsel's performance must be highly deferential. *Strickland* at 689. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999).

**{¶49}** Hundley offers that counsel's improper failed impeachment of M. Clark constituted ineffective assistance:

> First, we determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client." When making this inquiry, the court will presume that licensed counsel has performed in an ethical and competent manner. Second, we determine whether "the defense was prejudiced by counsel's ineffectiveness." Prejudice requires a showing to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

(Internal citations omitted.) *State v. Bankston*, 8th Dist. Cuyahoga No. 92777, 2010-Ohio-1576, ¶ 55.

**{¶50}** Counsel failed to use a written statement made by M. Clark to impeach M. Clark's trial testimony but subsequently attempted to use the statement during cross-examination of the officer that took the statement. Counsel also failed to invoke Evid.R. 609 to impeach M. Clark's credibility for prior criminal acts. While counsel did not secure a copy of the criminal history, counsel was able to secure testimony that the witness had several felony drug convictions/charges as well as cases for having a weapon while under disability.

**{¶51}** After reviewing the record, we agree that Hundley has failed to demonstrate how he was prejudiced by counsel's asserted errors and that "but for" the errors, "the result of the proceeding would have been different." *Id*.

**{¶52}** The third assignment of error is without merit.

## IV. Conclusion

**{¶53}** Appellant's convictions are affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

FRANK D. CELEBREZZE, JR., J., CONCURS;
SEAN C. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY IN PART WITH SEPARATE OPINION

SEAN C. GALLAGHER, P.J., CONCURRING IN JUDGMENT ONLY IN PART:

**{¶54}** I respectfully concur in judgment only with respect to the discussion regarding Hundley's prearrest silence. I would find that any resolution of that argument is unnecessary. Any perceived error in the admission of the prearrest silence was corrected during the state's rebuttal argument when the trial court, as the trier of fact in the bench trial, stated it would not consider Hundley's prearrest silence in rendering the verdict. (Tr. 1069:3-12.) Any purported errors with respect to the initial admission of the prearrest silence evidence and arguments are, at the worst, harmless under Crim.R. 52(A). As to the remaining assignments of error, I fully concur with the majority's conclusions.