[Cite as *In re C.J.R.*, 2015-Ohio-3477.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 102253**

---

## IN RE:    C.J.R.
## [A Minor Child]

---

## JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL 14108254

**BEFORE:**  McCormack, P.J., Stewart, J., and Boyle, J.

**RELEASED AND JOURNALIZED:**  August 27, 2015

**ATTORNEYS FOR APPELLANT**

Timothy Young
Ohio Public Defender

Brooke M. Burns
Assistant State Public Defender
250 East Broad Street
Suite 1400
Columbus, OH 43215


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Jonathan M. McDonald
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

TIM McCORMACK, P.J.:

{¶1} C.J.R. ("CJR") appeals his delinquency adjudication in the Cuyahoga County Court of Common Pleas, Juvenile Division, for rape, kidnapping, and sexual imposition. He argues that finding him delinquent was against the manifest weight of the evidence. For the following reasons, we affirm the juvenile court's adjudication.

**Procedural History**

{¶2} In June 2014, CJR was charged with three counts of rape in violation of R.C. 2907.02(A)(2) in Counts 1 through 3, kidnapping in violation of R.C. 2905.01(A)(4) in Count 4, kidnapping in violation of R.C. 2905.01(A)(2) in Count 5, and gross sexual imposition in violation of R.C. 2907.05(A)(1) in Count 6. The complaint arose from acts that occurred on the evening of February 11, 2014, at CJR's home.

{¶3} The case was tried on October 9, 2014, at which time the court heard testimony from the following: CJR; CJR's mother, C.R.; his brother; the victim, L.S.; the victim's mother; the victim's boyfriend; and Detective Ronald Stolz. Following trial, the court adjudicated CJR delinquent of all three counts of rape, of kidnapping in Count 5, and of sexual imposition in violation of R.C. 2907.06(A)(1) as the lesser-included offense of gross sexual imposition in Count 6. The court dismissed Count 4, the kidnapping charge, and referred the matter for a pre-dispositional report that included a sex offender assessment.

**{¶4}** At the disposition hearing, the court heard from counsel, CJR's probation officer, L.S., and L.S.'s parents. The court then committed CJR to the Ohio Department of Youth Services for a minimum of two years. CJR appealed the decision of the juvenile court, raising one assignment of error: The court's adjudication of delinquency was against the manifest weight of the evidence.

## Evidence at Trial

**{¶5}** L.S., age 15 at the time of the incident, testified that she met up with CJR, age 17, on the evening of February 11, 2014, because he wanted to "hang out." Because they lived in the same neighborhood, they planned to meet partway between their houses and walk together to CJR's house. L.S. stated that she met CJR through a mutual friend. The encounter was arranged through texting. They had met up at CJR's house on "two or three" previous occasions. While walking, CJR informed L.S. that he had DMT (the hallucinogenic drug Dimethyltryptamine). They went to CJR's house at approximately 6:00 p.m. L.S. stated that they walked through the front room, passing CJR's brothers, continued down a small hallway, and walked into CJR's bedroom.

**{¶6}** She stated they were in CJR's bedroom with the door closed, "hanging out, and talking and listening to music," when he eventually pulled out a pipe and took two or three hits of DMT from it. He asked her if she wanted to try it, and she said she was not sure; however, she eventually tried it. L.S. stated that she "coughed it out, and then [her] chest started to hurt" and she felt like she was having a panic attack. She testified that

CJR told her to lie down on the mattress that was on the floor. She laid on the mattress, and he laid down next to her.

{¶7} L.S. testified that CJR then began to touch her, on her sides and her breasts, and told her she was pretty. This made her uncomfortable. She testified that she told him "that's a bad idea because I have a boyfriend and I don't want to," but he continued touching her. She said he began to undress her and she "[sat] there confused * * * because [she] was trying to think of how to get out of * * * the situation." L.S. testified that she repeatedly told CJR she was uncomfortable, she did not like him that way, and they should not be doing this. He then touched her vagina, placing his fingers inside and on the outside. When he began to touch her vagina, she tried to move his hand away and she told him to stop. He then began removing her pants, and she tried to pull them back up and told him she did not want him to take them off. He continued to remove her underpants, and she, once again, told him no and that she was uncomfortable. She did not succeed in preventing CJR from removing her clothes. L.S. testified that CJR kept telling her "it's okay."

{¶8} According to L.S., CJR then proceeded to "use his mouth * * * on [her] vagina" while she "kept saying no" and she tried to "move him away." L.S. testified that CJR then "shoved his fingers in [her] mouth" and told her that she was supposed to like it. She told him that she did not like it, and she pushed his hand away. L.S. testified that CJR then told her he needed to get something, and he got up, turned the light off, and left the room. She asked him if she could put her clothes back on and leave, to which he

responded in the negative. He was gone for "maybe two minutes." On cross-examination, L.S. stated that she was afraid to leave at this time because she did not know what CJR was going to get. On redirect, L.S. further explained why she did not put her clothes on when CJR left the room:

> I was afraid to because I didn't know how long he would be out of the room, if I would have time to put my clothes on and leave, and I didn't know what he was going to get, so — he had mentioned earlier that he wished he had his handcuffs and so I was afraid if he was going to get handcuffs or some type of weapon. I was afraid so I didn't want to put myself in danger.

{¶9} While CJR was out of the bedroom, L.S. texted her boyfriend, asking for help. She texted that she was at CJR's house and could not leave. She put her phone down when CJR returned to the bedroom.

{¶10} When CJR returned, he did not appear to have anything in his possession. L.S. testified that he closed the door and laid down next to her on the mattress, where he had lain before. He took his jeans off and laid on top of her. L.S. testifed that CJR said "he was just messing around and wasn't really going to do it, and [she] said, well, good," and she asked if she could get up then. He said "no" and he "did it anyways," and he placed his penis in her vagina and began to have intercourse with her. She stated that she was angry and she was struggling and telling him to stop and to get off of her. He then put his hand over her mouth and told her to be quiet because people would hear her.

{¶11} L.S. testified that after he removed his hand from her mouth, he placed his hand "around [her] neck," at which point he asked her if she was afraid. She told him she was angry. According to L.S., CJR then told her that "he wanted to hear [her] beg for him to stop." She told him that she would not beg. During this time, he continued to have intercourse with L.S. while she continued to struggle, telling him to stop. She stated that after approximately ten minutes, CJR "got * * * angry because he said it was too much work" and she was "struggling too much." L.S. stated that CJR then got off of her and told her to "suck his penis" and pushed her head toward his penis. When she refused, he acquiesced.

{¶12} L.S. then began to put her clothes on. She testified that CJR told her not to tell anyone "because that would mean that [she] was cheating on [her] boyfriend." She then left CJR's house. It was approximately 8:30 p.m. She stated that she did not see anyone as she was leaving. On cross-examination, she denied hugging CJR. L.S. testified that she was in CJR's home for approximately "three or four hours," and during that time, she was naked for "probably about half of the time, * * * about an hour and a half to two hours." She stated that during that time period, CJR was forcing himself on her for "closer to an hour than two hours." L.S. testified that she did not consent to the sexual acts.

{¶13} Immediately upon leaving CJR's house, while walking home, L.S. called her boyfriend and told him what had happened. She testified that he became very upset. Her cell phone battery then died, and she proceeded home. She testified that when she

got home, all of the doors were locked and she had to knock in order to be let in. Her mother let her in. She plugged her cell phone in, and when it would not turn on, she went to the basement to use the house phone to call her boyfriend. After the conversation with her boyfriend, she went back to her room, where she saw several text messages from CJR, who was insisting on speaking with her. L.S. stated that she responded by text, informing CJR that she did not wish to speak with him anymore. According to L.S., CJR's texts continued through the next day, wherein CJR insisted on meeting with L.S. She advised him that she did not want to meet with him, and the texts stopped.

{¶14} That next day, L.S. stayed home from school, telling her mother that she was upset about a friend's situation and she did not want to go to school. She testified that the real reason she did not want to go to school was because of the incident with CJR the evening before. After speaking with her boyfriend again, she decided to report the incident to the police. She received a ride from a friend to the police station on the evening of February 12, where she reported to Detective Stolz that she had been raped. On cross-examination, L.S. admitted that she initially lied to the detective about her own use of DMT at CJR's house because she was afraid of her parents' reaction. After speaking with the detective, L.S.'s mother picked her up and drove her to the hospital, where an examination by a Sexual Assault Nurse Examiner ("SANE") was conducted. According to the nurse's report, L.S. did not want her mother present for the physical

examination. The report states that L.S. did not want her mother to know she had been sexually active with her boyfriend.

**{¶15}** L.S. stated that on the morning after leaving the hospital, she texted CJR in order to elicit a confession from him. She received a text in response, stating that he would "sign a confession note" if L.S. agreed to meet with him in person. L.S. testified that CJR also texted that he believed "a lot of girls like aggression."

**{¶16}** L.S.'s boyfriend, testified that he received a text from L.S. around 8:00 p.m. on the evening of February 11, 2014. He stated that upon receiving her text, he was very upset and worried and he just wanted to help L.S. He testified that L.S. then phoned him around 8:30 p.m., sounding "very upset and just scared." After speaking with L.S., he advised her to contact the police about the events of that evening. He stated that he tried to comfort her. He then texted CJR, accusing him of being a horrible person. In response, CJR phoned L.S.'s boyfriend, telling him that the sex was consensual and that L.S. "wanted it."

**{¶17}** M.S., L.S.'s mother, testified that L.S. left their home sometime in the evening of the night in question and she was gone for "at least a couple of hours." M.S. stated that she had become frantic because she had not heard from L.S. all evening. M.S. testified that when L.S. finally returned home, "there was something noticeably wrong." She further stated that L.S. looked shocked, stunned, and frightened. M.S. repeatedly asked L.S. what was wrong, to which L.S. responded that she was fine, she just wanted to

use the phone, and she wanted to be left alone. Thereafter, M.S. discovered L.S. in the basement on the house phone, and she left her alone.

{¶18} M.S. testified that the next day, L.S. begged to stay home, indicating that she was not feeling well. M.S. allowed her daughter to stay home, and M.S. stayed home with her. M.S. stated that L.S. seemed "a little jittery" and "almost emotionless" that day. In the evening, after returning from another daughter's school concert, M.S. could not locate L.S. and began to text and call her. At approximately 11:00 p.m., she received a phone call from Detective Stolz, indicating that L.S. was at the police station. She then drove to the police station, picked up L.S., and drove her to the hospital.

{¶19} Detective Stolz testified that L.S. came to the police station the evening of February 12 "afraid [and] hesitant." She reported to the detective the events of the evening before at CJR's home. After receiving L.S.'s report, Detective Stolz notified L.S.'s parents and asked them to take L.S. to the hospital for a sexual assault examination. The police received the results of the rape kit test, which indicated the presence of amylase (saliva) on L.S.'s right breast that ultimately matched CJR's DNA. Based upon L.S.'s report and the rape kit results, the police conducted an investigation. The investigation included a forensic search of L.S.'s phone and interviews with L.S.'s parents and her boyfriend. Detective Stolz testified that L.S. initially denied smoking DMT at CJR's house on the evening in question because she was afraid of getting in trouble with her parents; however, she later admitted to the detective that she had smoked the illegal compound.

**{¶20}** In his own defense, CJR testified that on the evening of February 11, 2014, he and L.S. went to his bedroom around 6:00 p.m., where they spent "a couple hours." He stated that after he and L.S. smoked DMT from his pipe, "one thing led to another," and they began to have "completely consensual" sex. He testified that he helped L.S. take her clothes off, although she had taken her own pants off and "threw them across the room," and they had sex for a very brief time, "a minute." She then told him to stop, and he stopped. He admitted to kissing her vagina and inserting both his finger and his penis in her vagina. He denied, however, grabbing her throat, and he did not recall putting his fingers in L.S.'s mouth.

**{¶21}** CJR stated that he was "confused" when L.S. told him to stop because she "had initiated the whole incident." He stated that L.S. began to talk about her boyfriend, she put her clothes back on, they talked, she indicated that she had some missed phone calls or texts, she gave him a hug, and she left. He stated that he then deleted her phone number from his phone as he "didn't have any intention of talking to her later." According to CJR, he later received a phone call from L.S.'s boyfriend wanting to know what happened, to which CJR responded, "I had sex with your girlfriend."

**{¶22}** On cross-examination, CJR admitted to sending L.S. a text that read, "you didn't care about lying down with me and I told you I'm a little aggressive." He also stated that he told L.S. in a text, in reference to his aggression, that "a lot of girls are into that sort of thing." Finally, CJR admitted to sending a text to L.S. that read as follows:

I could have easily held your legs still. Think about it. Some girls like being treated like that from my experience. I just assumed the low self-esteem and the cutting yourself and taking to guys that are nowhere near good enough for you, etc. I'm not trying to justify anything, but I do care about you and really wish you would talk to me. It would take five minutes and make you feel better, I hope.

{¶23} He testified, however, that the above texts were made in sarcasm, stating, "I was joking." In his defense, he stated that "never did she raise her voice even a little bit, or she could have just tapped the floor like that to alert somebody * * *."

{¶24} C.R., CJR's mother, testified that she was at home on February 11 "the whole time L.S. was there." She stated that it was not uncommon for L.S. to be at their house. C.R. testified that she was in the kitchen preparing dinner when L.S. arrived and she said "hello" to L.S. C.R. also testified that she did not hear any unusual sounds coming from CJR's bedroom that evening, although she did hear L.S. and CJR talking in their small home.

{¶25} CJR's brother testified that he was playing video games in the living room with a younger brother when L.S. arrived on the evening of February 11. He and L.S. waved to each other when she arrived. The brother stated that L.S. was in CJR's bedroom approximately "two and a half hours tops." He testified that his mother was in the basement the entire time L.S. was at their house, "probably watching [television]." He further testified that he did not believe his mother ever saw L.S. that evening or even

knew she was there. Finally, he testified that CJR walked L.S. to the front door, and upon leaving, L.S. gave CJR a hug.

## Manifest Weight of the Evidence

{¶26} CJR argues that the juvenile court's adjudication of delinquency was against the manifest weight of the evidence. Primarily, he contends that L.S. was not credible. In support of his argument, he notes the following: L.S.'s "admitted lies," when L.S. initially told Detective Stolz that she did not use an illegal drug while at CJR's house; her "repeated desire to conceal things from her parents," where the SANE's report indicated that L.S. did not want her parents to know that she had been sexually active with her boyfriend; inconsistencies between her testimony and that of other witnesses, specifically regarding testimony concerning hearing nothing unusual in their small home and L.S.'s hugging CJR before leaving his home; and L.S.'s "illogical" explanation for remaining naked, alone, in CJR's bedroom for the two minutes he was gone.

{¶27} We note, initially, that the same standard of review for manifest weight of the evidence applies to juvenile and adult criminal matters. *In re G.R.*, 8th Dist. Cuyahoga No. 90391, 2008-Ohio-3982, ¶ 37, citing *In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746.

{¶28} A manifest weight challenge questions whether the state has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997). When reviewing a manifest-weight claim,

"[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶29} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶30} CJR was found delinquent on three charges of rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

**{¶31}** He was also found delinquent on the charge of kidnapping in violation of R.C. 2905.01(A)(2). This statute provides that "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [in order to] facilitate the commission of any felony or flight thereafter." R.C. 2905.01(A)(2).

**{¶32}** Finally, CJR was found delinquent of sexual imposition, the lesser included offense of gross sexual imposition in Count 6. R.C. 2907.06(A)(1) provides that "[n]o person shall have sexual contact with another * * * when * * * [t]he offender knows that the sexual contact is offensive to the other person * * * or is reckless in that regard."

**{¶33}** Here, L.S. testified that she repeatedly struggled to remove herself from CJR's grasp, specifically when he placed his mouth on her vagina and when he penetrated her with his finger and his penis. He ultimately stopped because she was struggling too much and it became too difficult for him. L.S. testified that on multiple occasions she told him to stop and she told him "no." She also testified that CJR put his hand over her mouth in order to keep her quiet when she protested and then placed his arm over her neck, requesting that she beg for him to stop. When he left her lying naked in his bedroom for a short moment, she stated that she was too afraid to move. At that moment, she texted her boyfriend asking for help. Immediately upon leaving CJR's house, she phoned her boyfriend while walking home and, again, upon arriving at home, reporting to her boyfriend about the evening's events. The next evening, she went to the

police station and reported that she had been raped. Thereafter, her parents drove her to the hospital, where a sexual assault nurse conducted an examination.

**{¶34}** CJR contends that the sexual acts were consensual. However, he admitted to texting L.S. that he thought girls liked aggression and he "could have easily held [her] legs still." He claimed that these comments, however, were made in jest.

**{¶35}** In this case, where both L.S. and CJR testified, their testimony necessarily invokes a credibility determination. The choice between credible witnesses and their conflicting testimony, however, rests solely within the province of the trier of fact, and we are not permitted to substitute our judgment for that of the factfinder. The factfinder has the benefit of viewing the witnesses and observing their demeanor, gestures, and voice inflections and to use these observations to weigh credibility. *Seasons Coal Co. v. Cleveland*, 10 Ohio St. 3d 77, 80, 461 N.E.2d 1273 (1984). In choosing between witnesses and their conflicting testimony, the trial court in this case found L.S.'s testimony more credible than that of CJR, which it was free to do. It is well settled that a rape conviction may rest solely on the victim's testimony, if believed. *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 40.

**{¶36}** L.S.'s testimony, however, was also significantly supported by the testimony of other witnesses. L.S.'s boyfriend testified that he received a text from L.S. around 8:00 p.m. on the evening of February 11, 2014, and upon receiving her text, he became upset and concerned, and he wanted to help L.S. He also testified that L.S. phoned him around 8:30 p.m., as she was leaving CJR's house, and she sounded upset and scared.

L.S.'s mother testified that when L.S. returned home that evening, it was apparent that something was wrong and L.S. appeared shocked, stunned, and frightened. Detective Stolz testified that when L.S. came to the police station the following day to report the rape, she was afraid and hesitant. He further testified that after he received L.S.'s report, he requested L.S.'s parents take L.S. to the hospital for a sexual assault examination.

**{¶37}** After reviewing the record and deferring to the trier of fact's credibility assessment, we are unable to conclude that the trier of fact lost its way and created such a manifest miscarriage of justice that a new trial is warranted. CJR's sole assignment of error is overruled.

**{¶38}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the juvenile court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, PRESIDING JUDGE

MELODY J. STEWART, J., and
MARY J. BOYLE, J., CONCUR