[Cite as *In re C.B.*, 2020-Ohio-4749.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE C.B.                                            :

                                                      :           No. 109095

A Minor Child

                                                      :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 1, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-18-111309

---

### *Appearances:*

David L. Doughten, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael Timms, Assistant Prosecuting Attorney, *for appellee.*

ANITA LASTER MAYS, P.J.:

{¶ 1} Defendant-appellant C.B. appeals the trial court's adjudication of delinquency for one count of rape, R.C. 2907.02(A)(2), a felony of the first-degree if committed by an adult, and one count of abduction, R.C. 2905.02(A)(2), a felony of

the third-degree if committed by an adult. We affirm the juvenile court's adjudication.

## I. History of the Case

{¶ 2} On September 13, 2018, the state filed a complaint against C.B. for the rape and abduction counts. C.B. denied the charges and the adjudication hearing was conducted on April 30, 2019. At the close of the evidence, the trial court denied C.B.'s Juv.R. 29 motion to dismiss the complaint.

{¶ 3} The trial judge issued the journal entry on May 31, 2019, finding C.B. delinquent and unruly and referred the matter for a predispositional report, sexual offender assessment, classification, and disposition. On August 6, 2019, the magistrate ordered that C.B.: (1) serve 12 months of community control; (2) perform two hundred hours of community service, (3) participate in the Protect program, (4) have no contact with the victim, (5) participate in a mentoring program for men, and (6) provide a DNA swab for the felony adjudication. The trial court overruled C.B.'s objections to the magistrate's decision and C.B. appealed.

## II. Assigned Error and Standard of Review

{¶ 4} C.B.'s single assigned error asserts that the trial court's judgment is against the manifest weight of the evidence. "[T]he same standard of review for manifest weight of the evidence applies to juvenile and adult criminal matters." *In re C.J.R.*, 8th Dist. Cuyahoga No. 102253, 2015-Ohio-3477, ¶ 27, citing *In re G.R.*, 8th Dist. Cuyahoga No. 90391, 2008-Ohio-3982, ¶ 37, citing *In re J.A.S.*, 12th Dist. Warren No. CA2007-04-046, 2007-Ohio-6746.

A challenge to the manifest weight of the evidence questions whether the state has met its burden of persuasion. *State v. Byrd*, 8th Dist. Cuyahoga No. 98037, 2012-Ohio-5728, ¶ 27. When considering a claim that a conviction is against the manifest weight of the evidence, this court sits as a "thirteenth juror" and may disagree "with the factfinder's resolution of conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The weight-of-the-evidence standard "addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387.

*In re D.C.*, 8th Dist. Cuyahoga No. 102165, 2015-Ohio-4367, ¶ 13.

{¶ 5} In our manifest weight review of a bench trial verdict, we recognize that the trial court is serving as the factfinder, and not a jury:

"'Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'"

*State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 25 (8th Dist.), quoting *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 6} In addition,

[w]e recognize that "[w]here a trial is not to a jury, a majority of the Court of Appeals may reverse a judgment on the weight of the evidence." *State v. Gilkerson*, 1 Ohio St.2d 103, 104, 205 N.E.2d 13 (1965), citing *Hnizdil v. White Motor Co.*, 152 Ohio St. 1, 87 N.E.2d 94 (1949), and construing former Section 6, Article IV, of the Ohio Constitution, which is similar to the current version of Section 3(B)(3), Article IV.

*In re D.L.*, 2016-Ohio-5834, 70 N.E.3d 1201, ¶ 17 (8th Dist.).

## III. Discussion

{¶ 7} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2901.01(A)(1) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." *Id.*

{¶ 8} R.C. 2905.02(A)(2) provides that "(A) No person, without privilege to do so, shall knowingly do any of the following" "(2) By force or threat, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." *Id.*

{¶ 9} C.B. maintains that the sexual activity was consensual and the evidence in the case does not support the delinquency adjudication. C.B. and Jane Doe ("Doe") were 15 years of age at the time of the incident. They met and attended school together in the fifth or sixth grade, were involved in an off-and-on relationship for several years and in an intimate relationship for over a year prior to the September 11, 2018 incident. C.B. requested that Doe meet him near Doe's school early that morning to discuss Doe's self-harming cutting issue. C.B. and Doe greeted with a hug and walked to Doe's school where Doe allowed C.B. to enter the building against school rules. The teens sat under a stairwell and discussed the victim's self-cutting behavior.

{¶ 10} Doe testified that C.B. and Doe were not in a relationship at the time of the incident. C.B. asked Doe whether she missed their intimacy and Doe

responded that she did not. (Tr. 24.) Doe testified that C.B. pushed her shoulders back, climbed on top of her, restrained her movement, and pulled down her tights. After penetration and ejaculation, Doe bit C.B. when he attempted to force her to perform oral sex. Doe said that she told C.B. to stop but C.B. did not. Doe stated that, after the incident, C.B. left and Doe cried for a while, then washed and went to class.

{¶ 11} Doe did not tell anyone about the incident until she texted her sister the next day that she had been raped. Doe's sister and mother did not get along with C.B., and Doe told them that she had not been involved with C.B. since 2017 or 2018. (Tr. 45.)

{¶ 12} Doe testified about Facebook screen shots of messages between Doe and C.B. Doe advised C.B. that he hurt her the morning of the incident when he pushed her down, pulled her hair, and grabbed her shirt but did not mention sex. (Tr. 32.) Later the same day, C.B. told Doe that it was Doe's fault and to "stop f**king cutting yourself, and he didn't give an f**k what it is that's wrong." (Tr. 33.)

{¶ 13} In additional messages, Doe inquired whether C.B. knew that he "practically raped" her. *Id.* C.B. responded "if I think that he raped me, if he and I want to break up." *Id.* "I told him he did rape me and were already broken up." Doe told C.B. to stop messaging and C.B. responded "we're going to break up if you cut yourself again for me." (Tr. 34.) Doe replied "goodbye" and Doe said C.B. responded "He said, I'm not about to lie, that he loves me and he was sorry and he doesn't want us to break up, that I'm his everything." *Id.*

{¶ 14} Doe also told C.B. that "I didn't believe [C.B.] raped me until I realized it today." (Tr. 35.) C.B. replied that they could stop having sex if she did not want to and he did not want her to leave. Doe also advised C.B. that she told her mother and sister about the incident so they probably could not be friends. During the incident, Doe said she told C.B. to stop and he told her "this is what I get for cutting." (Tr. 42.) Doe also stated that C.B. pushed her head down and her forehead hit the floor, which left a mark. "I was trying to get him off of me. But in the end his hands were — one of them was holding my left hand down. My right hand was underneath me, and his other hand I'm not sure." (Tr. 43.)

{¶ 15} Doe told her mother that she was wiling to speak with police. A rape kit was performed, Doe talked with Officer Alex Cruz ("Officer Cruz") and later Detective Sarene Saffo ("Detective Saffo") both with the Cleveland Police Department. Doe said that she was depressed and afraid after the incident because if it happened with someone that she trusts, it could happen with anyone.

{¶ 16} Doe admitted during cross-examination that she continued to have consensual sex with C.B. after C.B.'s dispute with Doe's mother and sister in 2017 or 2018:

Counsel:    You indicated to [your family] and to the police that you had not had consensual sex with C.B. since you broke up with him, correct?

Witness:    Yeah.

Counsel:    That's not true, is it?

Witness:    Like I said, it was an on-and-off relationship before.

Counsel: So you did have consensual sex with [C.B.] after the incident involving your sister, correct?

Witness: After the incident, yes.

Counsel: In fact, you did so on several occasions, correct?

Witness: Yes.

Counsel: How many would you estimate it was?

Witness: Three, maybe four.

(Tr. 45-46.)[1]

{¶ 17} Further to the issue, defense counsel emphasized, and Doe admitted, that Doe repeatedly lied to her family, Officer Cruz, and Detective Saffo about having consensual sex with C.B. after the incident between C.B. and Doe's sister. Doe explained that she was afraid that her mother would be upset, and that Doe was afraid of how her mother would react.

{¶ 18} The defense also points to Doe's Facebook quote as evidence supporting an ongoing relationship and possible motive for Doe's position in the instant case:

Counsel: Is it true that one of your Facebook quotes is listed as "Cheat on me, and that your house will be in flames?"

C.B.: Yes. But it's just a metaphor. * * * To me, it means if you cheat on me while in a relationship with me, it means we're never gonna [sic] talk, the friendship and everything is over. * * * It means that the house of friendship that we've built will be destroyed.

---

[1] The parties' appellate briefs construe the quoted exchange to mean that C.B. and Doe engaged in consensual sex after the incident. We quote the language at issue for clarification.

(Tr. 51.)

{¶ 19} The defense pointed out additional alleged conflicts between Doe's statements and testimony: Doe (1) screamed, (2) tried to scream, and (3) did not scream. (Tr. 67.) Also, that C.B. (1) punched Doe in the face, (2) did not punch Doe in the face, (3) slapped Doe in the face, and (4) did not punch or slap her but caused her to bump her head on the ground. *Id.* Doe wore a painter mask to school due to paint fumes but did not recall what happened to the mask during the incident.

{¶ 20} Doe's sister testified briefly that Doe informed her of the incident, told their mother, and the incident was reported. She also confirmed receipt of the Facebook messages. The sister stated she did not know C.B. but that they attended school in the same building.

{¶ 21} Sexual Assault Nurse Examiner Jennifer Beigie with the MetroHealth Medical Center met with Doe in the presence of Doe's mother. Doe advised that there was vaginal penile penetration "and forced oral [sic] to the assailant's genitals." (Tr. 96.) Doe said that C.B. pushed her and she fell on her back. "He rolled me over. I kept pushing myself off of him, told him to stop." (Tr. 97.) "I kept trying to get way." *Id.* "He got my pants down and hit my face. He eventually got my pants down. He took his pants off," penetrated vaginally, and "[t]hen he just left." (Tr. 98.) The nurse did not find evidence of an injury. The assault narrative indicates "patient states forced oral to the assailant's genitals." (Tr. 100.)

{¶ 22} Officer Cruz, equipped with a bodycam, responded to Doe's house for the initial report and talked with Doe in the presence of her mother. Officer Cruz provided an account of Doe's description of the incident similar in content to Doe's testimony. Officer Cruz proceeded to C.B.'s house where C.B. was arrested. Officer Cruz noted in the police report that C.B. hesitated before he responded to the question of whether the encounter was consensual. The report does not reflect the bodycam evidence that C.B. nodded his head to indicate that the encounter was consensual before the affirmative verbal response. (Tr. 117.) Officer Cruz testified that the information obtained from C.B. and Doe indicated "[t]hey had consensual or non-consensual sex." (Tr. 119.)

{¶ 23} According to Officer Cruz, C.B. answered the door, called his mother to come downstairs because the police were there, and sat down. Officer Cruz handcuffed C.B. prior to asking any questions, placed C.B. in the zone car, and returned to the house to speak with C.B.'s mother.

{¶ 24} The trial court inquired:

Court: So you haven't asked him any questions?

Officer Cruz: I have not.

Court: So your probable cause was just based on what the alleged victim said?

Officer Cruz: To detain somebody, yes.

Court: And after you spoke with the child and it was reported to you that there was a conflict, why didn't you just let him go?

Officer Cruz: Your Honor, again, I spoke with my supervisor as to the nature of the charges — well, not charges at that time, but that the booking was kidnapping and rape.

(Tr. 124.)

{¶ 25} Officer Cruz confirmed the trial court's observation that C.B. was immediately "cuffed" and "detained" "without learning his side of the story" and placed him in the back of a zone car wearing only a pair of shorts "without learning his side of the story." The trial court stated that: (1) the alleged incident transpired more than 40 hours prior to the report, (2) the alleged victim was at home, safe with a parent, (3) there were no reports that C.B. had threatened Doe or used a weapon or made threats to Doe, and (4) the police knew where C.B. resided.

{¶ 26} The trial court then asked counsel for the parties whether there were "[a]ny further questions of this witness based on what the Court has asked the witness?" (Tr. 127.) Defense counsel had Officer Cruz confirm that 40 hours had passed since the incident. C.B. waived his *Miranda* rights and spoke with the officers after he was handcuffed and placed in the police car. (Tr. 113.)

{¶ 27} Detective Saffo with the sex crimes and child abuse unit reviewed reports and interviewed witnesses including the parties during her investigation. Detective Saffo also walked through the school with the principal and interviewed Doe three times. Detective Saffo testified:

I learned in my conversation that the sequence of events that she alleged to me were inconsistent. I learned that she told me in the beginning that she hadn't had sex with C.B. since they'd broken up. Then I learned that she admitted to me that she did have consensual sex one or two months prior to the incident occurring.

She states that she was embarrassed. That's why she didn't say anything.

I later learned that Doe opened the door for C.B. to come into the school after my reviewing of the surveillance. * * *

During my interview with her, [Doe] indicated that she did that because she didn't want to be expelled from school.

(Tr. 141.)

{¶ 28} Detective Saffo cited several inconsistencies regarding whether Doe screamed during the incident, whether she was punched or hit in the face, and whether Doe and C.B. walked into the school together or Doe provided access to the school. Doe stopped responding to questions during the third interview when Detective Saffo inquired about the painter's mask that Doe's mother advised Detective Saffo that Doe was wearing at the time of the incident. Detective Saffo stated there was no inconsistency regarding consent.

{¶ 29} The trial court determined that "the allegations of the complaint have been proven beyond a reasonable doubt." Journal entry No. 0912393826, p. 1. (May 31, 2019). We find that the trial court's judgment is supported by the manifest weight of the evidence.

{¶ 30} Doe consistently maintained that she did not give consent and that she told C.B. to stop but C.B. did not. Doe also stated that C.B. pushed her back, placed his body weight on top of her, and that one of her arms was pinned under her during the act so that she could not move. A victim's testimony is sufficient to support a conviction for sexual conduct. *State v. Bacho*, 8th Dist. Cuyahoga No. 93828, 2010-Ohio-4885. *See also State v. Timmons*, 10th Dist. Franklin

No. 13AP-1038, 2014-Ohio-3520, ¶ 23, citing *State v. Henderson*, 10th Dist. Franklin No. 10AP-1029, 2011-Ohio-4761, ¶ 17.

{¶ 31} Doe's statement that C.B. caused her to bump her head when he pushed her shoulders back and climbed on top of her restricting her movement also supports the elements of the abduction charge. Doe testified that her liberty was restrained and that she was afraid and cried for a while after the incident before Doe washed and attended class. The element of restraining another's liberty may be proven by evidence that the defendant has "'limit[ed] one's freedom of movement in any fashion for any period of time.'" *State v. Wright*, 8th Dist. Cuyahoga No. 92344, 2009-Ohio-5229, at ¶ 23, quoting *State v. Wingfield*, 8th Dist. Cuyahoga No. 69229, 1996 Ohio App. LEXIS 867.

{¶ 32} Considering the entire record, this court cannot say the trial court clearly lost its way and created such a manifest miscarriage of justice that the delinquency adjudication must be reversed. *Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997).

{¶ 33} The single assigned error lacks merit.

## IV. Conclusion

{¶ 34} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., and
MARY EILEEN KILBANE, J., CONCUR