[Cite as *State v. Harris*, 2024-Ohio-2583.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                      :

    v.                                                      :

No. 113388

CURTIS HARRIS,                                   :

    Defendant-Appellant.               :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 3, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-681786-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Mary Grace Tokmenko, Assistant Prosecuting Attorney, *for appellee.*

Donald Butler, *for appellant.*

EILEEN A. GALLAGHER, P.J.:

{¶ 1} Defendant-appellant, Curtis Harris, appeals the conviction for forcible rape subsequent to a jury trial.  For the reasons that follow, we affirm.

## I.    Factual Background and Procedural History

{¶ 2} On June 6, 2023, a Cuyahoga County Grand Jury returned an indictment charging Harris with two counts of rape in violation of R.C. 2907.02(A)(2) each of which carried a notice of prior conviction pursuant to R.C. 2929.13(F)(6) and a repeat-violent-offender specification under R.C. 2941.149(A).

{¶ 3} The State's theory of the case was that Harris raped 25-year-old T.J. during the night of June 13 into June 14, 2022 through digital penetration (Count 1) and vaginal penetration (Count 2). The defense argued that the evidence was consistent with consensual sex and that the State failed to prove beyond a reasonable doubt that Harris compelled the sexual conduct through force or threat of force.

{¶ 4} The case came for trial in October 2023.

{¶ 5} The parties stipulated that Harris had previous convictions for aggravated robbery (R.C. 2911.01(A)(1)) and felonious assault (R.C. 2903.11(A)(1)) from Cuyahoga C.P. No. CR-09-522687-A.

### A. The Examination of T.J.

{¶ 6} T.J. testified that she met Harris while they were both working at Harris' brother's birthday party on October 8, 2021. She described the party as a "male review" party in which male entertainers danced and stripped for the audience's entertainment. Harris worked security for the event and T.J. collected money from audience members and otherwise assisted the dancers. T.J. and Harris spoke to each other at the event and "hit it off," exchanging contact information.

**{¶ 7}** Within a week they met at a restaurant for a date and had a "good connection." They talked and then went to Harris' home, where they "cuddl[ed]" but did not engage in sexual activity.

**{¶ 8}** After that first date, they continued talking and spending time together. They had consensual sexual intercourse on two occasions, once at Harris' home and once in his car. They communicated over text messages and over electronic messages through the social-media application, Instagram. After their second sexual encounter, communication slowed until January 2022 since T.J. was involved in a car accident that had her largely homebound.

**{¶ 9}** Between January and June 2022, Harris and T.J. continued exchanging electronic messages. The State introduced photographs of these messages into evidence and T.J. described them to the jury. Several messages refer to their previous sexual encounters and Harris expressed a desire to have sex again. In one instance, T.J. specifically told him that he could come over to her house but that she did not want to have sex. They did not see one another during this period.

**{¶ 10}** On June 13, 2022, Harris messaged T.J., saying that he was "[t]rying to see you for real." T.J. was agreeable to meeting because she felt she had been clear about not wanting to have sex. T.J. agreed to come to a basketball game in which Harris was playing that evening. T.J. attended the game and spoke with Harris "a little bit" during which Harris asked her to come to his home and she said she would think about it.

{¶ 11} Later that evening, T.J. texted Harris to ask if he was still awake. He said that he was and T.J. told him that she would "come over for a little bit."

{¶ 12} T.J. drove to the house, arriving around 11:00 p.m., and Harris met her in the driveway. They walked up to Harris' third-floor apartment together and went to his bedroom. He watched some television, with Harris in his bed and T.J. watching from outside the bed. Harris smoked some marijuana and they talked with Harris listening to her and comforting her about the car accident in which she was involved.

{¶ 13} T.J. continued as follows:

[E]ventually I did end up getting into the bed just to get comfortable because his house seemed a little cold. . . . I had been through a lot that whole beginning of the year with my car accident and stuff so just having another person interaction, being able to hug them, being able to cuddle or just talking to somebody was something that I was looking forward to so I didn't mind whatever was happening at that moment until it pretty much escalated a little bit more once he got me in my comfortable or vulnerable state.

{¶ 14} They continued cuddling under the covers on his bed, laughing and watching television. But T.J. said there came a point where Harris "[got] up and [went] right in front of me and then he proceeded to take down his pants and try to force me to give him oral sex." T.J. told him to stop and pushed him away at which point Harris "back[ed] off." T.J. continued testifying as follows:

[W]e started kissing and then he started just kind of taking over and I could tell that his hands was going in places that I didn't want him to go so I kept telling him to stop, stop, no, no, and then that's when things kind of got a little violent. . . .

So as I was trying to tell him no and everything, I could tell that he was starting to, like I said, get violent, drop all his body weight on me as far

as me not trying to move, but I'm trying to fight him off as much as I can. I don't remember everything but all I remember is just telling him no, stop, and also used my forearm to push him back by his neck and also using my knees and everything. But I couldn't overpower him because he's so strong so he was trying to — like I said, it was a struggle to get my pants down. . . . I keep trying to tell him to stop, but he keeps telling me to calm down, calm down, you're playing.

And then as time went on, after he got my pants off and stuff, I remember him choking me for I don't know how long, it was pretty short, but it was long enough that I could feel the damage in my neck, and he said, "Stop f****** playing. You know why you're over here."

{¶ 15} T.J. described that, when Harris choked her, he used both hands around her whole neck. She related that she grew afraid "that this man is going to kill me" so she "just laid there like a dead body and let him do his business." She continued lying on her back, crying, as Harris penetrated her vagina with his penis. She said, "I remember he finished his business, I don't know if he finished his business inside of me or not . . . ."

{¶ 16} Harris then got off of T.J. and she "got up real quickly, got my pants and everything." Harris brought T.J. a towel but T.J. left the apartment without using it. Harris walked T.J. downstairs and tried to give her a hug, an act that she refused. T.J. told Harris to "have a good night" and drove herself to a 24-hour store, where she called a rape-crisis hotline.

{¶ 17} The hotline directed T.J. to drive to a location in Lorain, Ohio. She arrived there "really early in the morning." She met with a nurse, who examined her and took swabs for DNA. T.J. understood that the rape kit collected during the examination would be sent to the police.

{¶ 18} T.J. had no visible injuries but her throat "hurt for a few days" after the assault.

{¶ 19} T.J. met with a detective approximately a week after the assault. She identified Harris from a lineup of photographs.

{¶ 20} The prosecutor inquired further, as follows:

[PROSECUTOR]: I had asked you what he penetrated you with and do you remember what you said?

A: I did say his penis.

[PROSECUTOR]: Do you remember if you told the police or do you remember now, was there any other way that [Harris] penetrated you?

A: I don't remember.

{¶ 21} On cross-examination, T.J. admitted that Harris did not try to block T.J. from leaving the apartment after the sexual intercourse. He did not try to take her keys or phone. He did not ask her not to tell anyone about the encounter. To the contrary, he walked her out and offered a hug. She further admitted that she checked a box at the rape-crisis center indicating that she did not wish to speak with law enforcement.

## B. The Examination of Laura Gaertner

{¶ 22} Laura Gaertner testified that she is a registered nurse and is employed as a sexual assault nurse examiner ("SANE nurse") at the Nord Center. Gaertner examined T.J. on June 14, 2022.

{¶ 23} T.J. arrived at the Nord Center at 2:22 a.m. T.J. recounted to Gaertner the circumstances of the assault. T.J. said that she went to Harris' basketball game

at 8:00 p.m., then went roller skating. T.J. arrived at Harris' home at approximately 11:30 p.m. T.J. and Harris "were watching TV and relaxing." Then Harris pulled down his pants and put his penis on her. She described that she tried to move away but Harris got on top of her. She said she wrestled with him to get him off of her, at which time Harris became angry. She described that "[h]e grabbed my wrists and pulled my pants down." He put both hands on T.J.'s neck and "was basically choking me." T.J. decided to stop fighting Harris. Harris penetrated T.J.'s vagina with his penis. T.J. also reported that Harris penetrated her vagina with his fingers.

{¶ 24} Gaertner's examination revealed no visible injuries on T.J., but T.J. reported that her neck and wrists were sore. T.J. seemed to have a limited range of motion in her shoulder.

{¶ 25} T.J. did not want to speak with law enforcement on the night of the examination, so Gaertner informed her that she could speak with them later if she wished.

{¶ 26} On cross-examination, Gaertner admitted that T.J. appeared "clean" and "well groomed" upon her arrival; her clothes were not ripped or otherwise damaged. She was not tearful or crying and she made appropriate eye contact. She did not have visible injuries and was able to eat and drink with ease. Gaertner further admitted that it was not her job as a SANE nurse to determine if a patient is being truthful about an alleged assault.

## C. The Examination of Ashondre Welch

{¶ 27} Ashondre Welch testified that he is employed as a patrol officer employed by the City of Cleveland Division of Police. Welch collected the sexual assault kit from the Nord Center on June 21, 2022 and brought it to the evidence room at the police department. It is his understanding that the kit was thereafter transferred to the medical examiner's office.

{¶ 28} At the Nord Center, Welch was informed that T.J. did not want to speak with him.

## D. The Examination of Sarene Saffo

{¶ 29} Sarene Saffo testified that she is employed as a detective in the Cleveland Police Department where she investigates sex crimes and child abuse.

{¶ 30} Harris consented to the collection of his DNA during the investigation. Saffo collected buccal swabs from him. It is her understanding that the swabs were thereafter transferred to the medical examiner's office.

## E. The Examination of Darryl Turner

{¶ 31} Darryl Turner testified that he is employed as a detective in the Cleveland Police Department where he investigates sex crimes and child abuse. Turner was assigned to investigate the allegations against Harris on June 22, 2022.

{¶ 32} Turner interviewed T.J. He then called Harris, who agreed to an interview but did not show up for it. Turner was able to interview Harris approximately four or five months later. A search warrant was obtained for Harris' account on the social-media website, Instagram.

{¶ 33} On cross-examination, Turner admitted that he did not visit the scene of the alleged assault. He did not execute a search warrant for T.J.'s Instagram account or subpoena cell-phone records for either Harris or T.J.

**F. The Examination of Hristina Lekova**

{¶ 34} Hristina Lekova testified that she is employed as a forensic DNA analyst at the Cuyahoga County Regional Forensic Science Laboratory. She acted as the technical reviewer in this case, "mak[ing] sure that findings in this case correspond[] with the actual data in the case and all the standards and controls are followed."

{¶ 35} A DNA swab taken from T.J.'s thighs revealed the presence of DNA matching Harris. The match was "882 septillion times in an African American person, 13.9 octillion times more probable than coincidental in an unrelated Caucasian person, and 13.1 octillion times more probable than coincidental in an unrelated Hispanic person."

{¶ 36} A DNA swab taken from T.J.'s neck revealed the presence of DNA matching Harris. The match was "2.89 quadrillion times more probable than a coincidental to unrelated African American person, 2.88 quadrillion times more probable than coincidental to unrelated Caucasian person, and 47.7 quadrillion times more probable than coincidental to unrelated Hispanic person."

{¶ 37} On cross-examination, Turner admitted that several samples tested presumptively positive as seminal fluid, but the result could not be confirmed because no sperm were found when the samples were reviewed under a microscope.

She further admitted that the testing did not determine whether Harris' DNA was deposited through a primary or secondary transfer. The testing also did not reveal whether the DNA came from skin cells or through a biological fluid.

### G. The Motion for Judgment of Acquittal

{¶ 38} The State rested after Lekova's testimony, offering 11 exhibits into evidence with no objection from the defense. Harris then moved for acquittal pursuant to Crim.R. 29. The trial court granted the motion as to Count 1 (rape through digital penetration) and denied it as to Count 2 (rape through vaginal penetration).

{¶ 39} The defense then rested without presenting a case. Harris renewed his Crim.R. 29 motion for acquittal, which was denied.

### H. The Verdict

{¶ 40} The jury found Harris guilty of Count 2 (rape through vaginal penetration). The trial court found Harris guilty of the specifications; it found him to be a repeat violent offender and further found that he had a prior conviction for an offense of violence.

### I. The Sentence and Appeal

{¶ 41} The court held a sentencing hearing on October 20, 2023.

{¶ 42} The court found Harris to be a Tier III sex offender and explained his registration duties. The State addressed the court. The defense addressed the court, summarizing several character letters submitted from Harris' friends and family.

Harris' mother addressed the court. Harris declined to address the court on advice of counsel, pending an appeal.

{¶ 43} The court then announced its sentence. It sentenced Harris to an indefinite prison term under the Reagan Tokes Law, consisting of a minimum term of eight years and a maximum term of 12 years.

{¶ 44} Harris appealed, raising the following assignments of error for review:

### First Assignment of Error

The Trial Court erred in denying Appellant's motion for acquittal on the rape charge when the state failed to present sufficient evidence to sustain the conviction.

### Second Assignment of Error

Appellant's conviction is against the manifest weight of the evidence.

## II. Law and Analysis

{¶ 45} We address Harris' assignments of error together, as they are intertwined. Harris contends that his rape conviction should be vacated, arguing that there was insufficient evidence that he compelled T.J. into sexual conduct by force or threat of force. Even if there were sufficient evidence, the argument goes, we should reverse the conviction because the verdict was against the manifest weight of the evidence.

{¶ 46} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41 (8th Dist.), citing *State v. Thompkins*, 78

Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 47} An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt. *Id.*; *see also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). We must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 48} The elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See, e.g.*, *State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.), citing *State v. Durr*, 58 Ohio St.3d 86 (1991). Circumstantial evidence and direct evidence have "equal evidentiary value." *Wells* at ¶ 26, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.).

{¶ 49} A person commits forcible rape under R.C. 2907.02(A)(2) by engaging in sexual conduct with another person "when the offender purposely compels the other person to submit by force or threat of force." "Force" means "any

violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A).

{¶ 50} Here, T.J.'s testimony, if believed, would convince a reasonable factfinder of Harris' guilt beyond a reasonable doubt. T.J. testified that she voluntarily went to Harris' house and consensually cuddled with him in his bed. When Harris propositioned her for oral sex, she declined and Harris desisted for a time. The two consensually kissed. T.J. testified, however, that when Harris advanced toward sexual intercourse, she repeatedly told him "no" and asked him to stop. Despite these protestations, and despite the fact that T.J. was fighting against the interaction using her forearms and knees, Harris persisted, using his body weight to hold her down and "choking" her with both hands on her neck until she relented out of fear. Harris removed T.J.'s pants and penetrated her vagina with his penis.

{¶ 51} This evidence was sufficient to support Harris' conviction. *See, e.g.*, *In re C.B.*, 2020-Ohio-4749, ¶ 30 (8th Dist.) (sufficient evidence where the victim did not give consent and told the defendant to stop, but the defendant persisted and placed his body weight on top of her, among other force); *In re L.S.*, 2023-Ohio-4122, ¶ 43 (8th Dist.) (defendant pulled off the victim's underpants despite her protestations and she could not get the defendant off of her by pushing on his chest). Having found sufficient evidence to support the conviction, we turn to a consideration of whether the verdict was against the manifest weight of the evidence.

{¶ 52} A manifest-weight challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion at trial. *See State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins* at 387; *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.).

{¶ 53} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a "'thirteenth juror'" and may disagree with "the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reviewing court must examine the entire record, weigh the evidence and all reasonable inferences, consider the witness' credibility and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin*, *supra*.

{¶ 54} Harris' argument about the weight of the evidence focuses on a perceived lack of corroborating physical evidence supporting a conclusion that the sexual conduct was nonconsensual. He points out that T.J. had no physical injuries from the alleged assault. He further contends that certain facts cast significant doubt on T.J.'s testimony about the assault. For example, he says it should be hard to believe that Harris raped T.J. after initially desisting when T.J. declined to engage

in oral sex and when Harris voluntarily walked T.J. to her car after the encounter. Harris did not prevent her from leaving, threaten her, or ask her not to tell anyone about the encounter. The two had engaged in consensual sex several times in the past. T.J. initially declined to speak with police about the encounter.

{¶ 55} After a careful review of the record, we find that Harris' conviction is not against the manifest weight of the evidence.

{¶ 56} The SANE nurse testified that a person can be strangled and raped without presenting with visible injuries. Moreover, T.J.'s testimony was corroborated in other ways. The fact that T.J. willingly went to Harris' home on the date in question is corroborated by electronic messages exchanged between them. Harris' DNA was found on T.J.'s thighs and wrists. The SANE nurse examiner corroborated that T.J. drove to Lorain to undergo a sexual-assault examination after the incident and reported feeling pain, including in her neck.

{¶ 57} Harris argued his defense to the jury and the jury was free to reject any portion of the State's evidence or T.J.'s testimony that was inconsistent or otherwise unbelievable. The jury believed T.J. We cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed.

{¶ 58} We, therefore, overrule Harris' first and second assignments of error.

## III. Conclusion

{¶ 59} Having overruled Harris' assignments of error for the reasons stated above, we affirm.

The court finds there were reasonable grounds for this appeal.

It is ordered that the appellant recover from the appellee the costs herein taxed.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR