[Cite as *State v. Fluker*, 2023-Ohio-1295.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                     :

    Plaintiff-Appellee,        :

                               No. 111678

    v.                                :

CECIL FLUKER,                      :

    Defendant-Appellant.       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 20, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-665403-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eric Collins, Assistant Prosecuting Attorney, *for appellee*.

Susan J. Moran, *for appellant*.

ANITA LASTER MAYS, A.J.:

{¶ 1} Defendant-appellant Cecil Fluker ("Fluker") appeals his bench trial conviction and sentence for two counts of menacing by stalking in violation of R.C. 2903.211(A)(1), fourth-degree felonies.

{¶ 2} We affirm the trial court's judgment.

## I.  Facts and Procedural History

{¶ 3}  Fluker was convicted of menacing by stalking D.W. ("Mother") and her family, more particularly daughter Jane Doe ("Doe"), who was 17 years of age at the time of the indictments.  Count 1 of Fluker's indictment charged that on or about August 1, 2021, to October 30, 2021:

> Cecil Flucker [sic], by engaging in a pattern of conduct, did knowingly cause [Mother] to believe that Cecil Flucker [sic] will cause physical harm to [Mother] or a family member of Mother or cause mental distress to [Mother] or a family member of [Mother's].  Furthermore, the offender made a threat of physical harm to or against the victim.

Count 2 of the indictment mirrored Count 1 except for the furthermore clause that provided "the offender trespassed on the land or premises where the victim lives, is employed, or attends school."

{¶ 4}  The case was placed on the mental health docket and proceeded to a bench trial that began on May 24, 2022.  Mother and two members of the Cleveland Police Department ("CPD") testified for the state.  Fluker testified in his defense.

{¶ 5}  Mother stated that in February 2020, Doe became very angry with Mother, "busted" Mother's windows, and left the residence.  (Tr. 39.)  Doe later informed Mother that she was residing at the home of a woman named Belinda Massey ("Massey").

{¶ 6}  Mother said that Doe would sometimes return to the house "to eat, get food, get money, you know, stuff like that.  So I would make sure she was okay. But I never knew the exact whereabouts of where she was because she wouldn't tell me."  (Tr. 40.)  Doe would approach through the field that was adjacent to Mother's

house.  Mother suspected that "somebody dropped her off on the next street." (Tr. 40.)  During calls with Doe, Mother often heard an unknown male speaking loudly in the background.  She learned that the male was Fluker in August or September 2021.

{¶ 7}  Doe was away for over a year.  Mother explained, to establish that Doe was a member of the household during the relevant period, that Doe graduated from high school in August or September 2021, "a couple of days * * * prior to her coming back home."  (Tr. 42.)  Mother said that Doe returned home because Fluker was abusing her and that she observed fingerprints on Doe's neck and face.  Two to three weeks after Doe's return, Mother found Doe another place to stay because Mother observed a male driving by the house and taking photographs of Mother and the family.  The male was driving a silver car that Doe said belonged to Fluker's brother.  Mother contacted police but did not go to the station as the police advised.

{¶ 8}  The state introduced copies of several screen shots of threatening text messages purportedly sent by Fluker to Doe who sent the screen shots to Mother.  The messages included threats to  kill Doe and her family, burn the house down, and have people shoot into the house if Doe did not return to him.  Fluker's cell phone number is listed at the top of one of the screen shots.

{¶ 9}  Mother said Fluker knew Doe was staying with Mother and that Fluker called Doe one night and said, "'I'm in your house.'  When I got up to go [sic] the stairs, he was going back out the window, upstairs window."  (Tr. 50.)  Mother said she did not see Fluker but heard sounds in the house and arrived downstairs in

time to see "the van that [Fluker] drives with 'school transportation' on it. It was pulling off."[1] (Tr. 51.) Mother did not state whether Doe was at the residence at the time.

{¶ 10} On approximately September 12, 2021, Mother was standing on the porch when she observed a tall male, who she later determined to be Fluker, walking back and forth in front of the house. The male stopped and asked whether Mother knew who "Mary" was and said Mary had taken a gun from him. Mother walked into the house to get her phone to call Doe whose middle name was Mary. She returned to see the male running through the adjacent field.

{¶ 11} Mother testified that someone shot into the home later that day and police were summoned. In addition to the report of a shot being fired, Mother showed police a first-floor windowpane that had been broken two days earlier. Doe was not home when the window was broken but Mother said that Doe texted Mother that "[Fluker] was threatening to break the window. * * * You — all need to get out of there." (Tr. 60.)

{¶ 12} Mother showed police the screen shots of text messages reportedly sent to Doe by Fluker. Doe was not in the house the day of the September 12, 2021 incident, but she communicated with police by phone. Mother confirmed that the only time Fluker came to the house and talked with her was on September 12, 2021, when she was standing on the porch.

---

[1] Fluker drove the van at the high school that Doe attended.

{¶ 13} Mother called police whenever she saw Fluker's van in the area and said that additional threatening texts were sent to Doe after the September 12, 2021 incident. Mother did not think that Doe wanted to be involved with the investigation and stated that Doe no longer resided with Mother and if Doe was with Fluker again Doe would not tell Mother. Mother also said the family had relocated because she did not feel safe.

{¶ 14} CPD Officer Michael Deighan ("Officer Deighan") responded to the scene on September 12, 2021. Mother told Officer Deighan that

> a male that was known to her who was, I believe, a teacher or security — I can't recall — but worked at * * * her daughter's school — texted her daughter, came over to the house and shot one round into the house and sent her daughter a picture of him inside the house.

(Tr. 73.)

{¶ 15} No bullet casing was recovered but Officer Deighan observed "a bullet hole [that entered] through the north side of the house into the son's room, and I do believe it lodged in his back wall." (Tr. 74.) A second bullet hole was not related to the current complaint. Doe was not at the residence at the time the officer arrived, but the officer talked with Doe telephonically to confirm the content and source of the text message screenshots. The officer verified that the screenshots presented for his review at trial were the ones he viewed at Mother's home.

{¶ 16} CPD Detective Sean Coleman ("Detective Coleman) talked with Mother several times beginning a few days after the incident. Mother forwarded five

screen shots to Coleman. One of the screenshots contained a telephone number publicly listed to Fluker.

{¶ 17} Detective Coleman first interviewed Fluker during a recorded phone call. Excerpts were played for the jury. Fluker admitted that he went to Mother's house around September 9th or September 12th and he knew Mother's address. Fluker did not take responsibility for breaking the window or the gunshot. The cell phone that Fluker used to communicate with the detective was the same number depicted in the text message screen shot. Fluker turned himself in a few weeks after the interview.

{¶ 18} Detective Coleman also monitored jail calls after Fluker's arrest, several of which were played for the jury. During the jail calls, Fluker mentioned going to Mother's house during the September 9th to September 12th, 2021 time period, that a gun was kept at the house where he resided, and that he lived in the city of Garfield Heights. Fluker also asked Doe what her "people" planned to do and offered to pay for the broken window.

{¶ 19} Detective Coleman confirmed that other than a bullet hole, there was no ballistic evidence to indicate a shooting occurred contemporaneous to the report. Detective Coleman was unable to speak directly with Doe, who stopped responding to his texts and failed to show up for appointments. The state rested, and Fluker's Crim.R. 29 motion for judgment of acquittal was denied.

{¶ 20} Fluker took the stand and corroborated that he has been in a relationship with Doe. Fluker did not meet Doe at school but met her at East 152d

and St. Clair Avenue "at a bus stop beat up real bad. And I jumped out and said, 'What is wrong with you? Where's your parents, or who are you?'" (Tr. 113.) Doe responded with a "bunch of lies" but gave Fluker her phone number. Fluker was not driving the school vehicle at the time. Fluker did not know that Doe was 17 but realized as time passed that Doe was young because she did "young things and want[ed] to fight." (Tr. 113-114.)

{¶ 21} Fluker resided in Garfield Heights with Massey who had taken him in because he was homeless. Doe later moved into the home and Fluker took care of Doe. "[A]ll of us was trying to help each other." (Tr. 115.) Fluker stated Doe had been living at his house the entire time, was still living there at the time of trial, and was "pregnant, like, right now again." (Tr. 101.)

{¶ 22} Fluker denied breaking the window, shooting into the house, and sending the threatening text messages. Fluker said that he, Doe, and P ("P"), a female acquaintance of Doe who lived near Doe's school, were involved in a three-way relationship. Fluker had an encounter with P without Doe, and P told him she wanted a one-on-one relationship. Fluker refused, and P angrily responded that her "peoples were coming." (Tr. 102.) Fluker ran from P's house and left some of his belongings, including his phone. P connected Fluker's cell phone to an internet application that provided cell phone location tracking, camera views and access, and the ability to send texts and make calls that appeared to come from Fluker's phone.

{¶ 23} Fluker said that P's family members lived on Mother's street and reportedly sent photographs of Mother and the family and the threatening text

messages.  Fluker explained that there was a lot of fighting and gunfire on Mother's street and that P and her friends often rode by Mother's house and urged Doe to come out to fight.

{¶ 24} Fluker admitted that he talked with Mother the day that Mother was standing on her porch:

> I told her, your daughter stole some stuff.  I think she stole a gun.
>
> And she said, my daughter don't steal.
>
> I said, well, I'm the one taking care of your daughter.  I'm just trying to tell you, I'm not trying to hurt you.

(Tr. 108.)

{¶ 25} Fluker clarified that the gun Doe took from the house was a bb gun that appeared to be authentic and was kept at Fluker's residence for security purposes.  Fluker also wanted Mother to know that he was not the one causing trouble:

> In my mind, because I do have mental issues — you get it.  And I've been through stuff before.  So in my mind when I seen [sic] [Mother] I wanted to tell her it's not me, and I was trying to show her.  And she didn't want to hear it.  Like, she just looked at me like an older guy with her young daughter.  And I'll kill you. Like, you know what I'm saying? Like it was no trying to talk to her.

(Tr. 119.)  Fluker said that Mother went into the house and returned with a real gun.  Fluker ran through the next-door field to the adjacent block.  That was the only time that Fluker encountered Mother.

{¶ 26} Fluker accused Mother of attempting to run him off the road with her children in the car and said the police told her to stop, though police testified there

were no reports of the event.[2] Fluker confirmed that he called Detective Coleman multiple times to say the allegations were not true and to turn himself in.

{¶ 27} As to the jail calls, Fluker asked Doe what Mother was going to do regarding the charges because Doe knew that Fluker was innocent and had tried to tell her Mother. Fluker offered to pay for the window to let Mother know he was trying to help her so Mother would feel secure that he was not the perpetrator. Fluker added that he had recently had a nervous breakdown and was taking medication.

{¶ 28} The trial court found Fluker guilty on both counts and continued the sentencing hearing due to Mother's desire to attend. Mother failed to appear at the June 6, 2022 sentencing. The state informed the trial court that Mother wanted a restraining order against Fluker and that Mother had become alienated from Doe.

{¶ 29} Defense counsel explained that Fluker's mental health issues were complicated by a traumatic brain injury and skull fracture suffered years earlier when Fluker was accidentally shot in the head by a friend playing with a gun. Fluker was "scared his mother would worry about [his] getting shot in the head" so he told her that he jumped off a building. (Tr. 141).

{¶ 30} Fluker admitted he had a history of making poor choices, particularly with relationships, and had also been homeless, which impeded his ability to receive proper mental health care. Fluker was tearful and apologetic about the situation

---

[2] Detective Coleman did state that officers may have been dispatched in response to a call but if no report was made there would be no record.

with Mother, to the prosecutor because he did not understand the prosecutor was trying to help him, to his lawyer, and to his mother who was present at the hearing.

{¶ 31} The trial court admonished Fluker for being involved in an "inappropriate" relationship as a 44-year-old man that began when Doe was 17 and was now 19 years of age at the time of trial:

> I'm not — I'm not agreeing to that. You are a 44-year-old man. You're not — I'm not agreeing to this living situation. I don't agree with it. So where are you going to live? * * * And you're not having — you're not going to be on my probation and have a relationship with a 19-year-old girl. * * * That started when she was basically 17. * * * You are 44 years old. * * * She's a troubled girl, and you're around young girls.

(Tr. 143-144.)

{¶ 32} The trial court and defense counsel told Fluker that Doe was not good for him and she was a troubled girl and that working around young girls with his lack of boundaries and developmental issues was not good.

{¶ 33} The trial court then admonished:

Court: It just burns me up. You're not here on that kind of case, so I can't punish you like you are. But I can tell you this, I'm not going to stand for it. If I put you on probation, you're not living with Belinda [Massey]. Period. And you're not — you're not having these relationships.

Are you still driving that van?

Fluker: The van is broke[n]. I was working for the school.

Court: I know. You shouldn't be working for the school. You don't know boundaries. Do you know what boundaries are? If you don't know when to stop your behavior. Your record is all about that. Your record is all about you not knowing what the boundaries are in personal relationships.

I think a lot of it is because of your developmental issues. I get it. But you're — you're really — you are this close to being charged with a rape of some girl you picked up in the van that you were trying to do this. Depending on the age.

Maybe he should go to the CBCF. I don't know.

* * *

You know what, I'm going to remand him for the CBCF. I'm not comfortable with the situation. The living situation is terrible.

* * *

Working around young girls with his lack of boundaries and understanding that.

(Tr. 144-146.)

{¶ 34} The trial court decided that Fluker "really needs programming on boundaries and decision-making and appropriate relationships." (Tr. 146.) Counsel agreed to inquire about potential programs.

Court: Your fines, fees, and costs are waived. You're going to be on probation for two years starting at the CBCF. Failure to comply with the terms and conditions of probation, you're facing 18 months on Count [1] and 18 months on Count [2] for a total of 36 months in prison.

If you go to prison, you're looking at up to two years of postrelease control. If you violate, you go back to prison for up to one half of the sentence that you were given, be charged with a felony called escape. They can make your supervision harder for you or longer.

(Tr. 146-147.)

{¶ 35} Fluker became visibly shaken and unable to sit up. The trial court summoned medical assistance. While waiting for their arrival, the trial court

reassured Fluker that he was not going to prison, that he would go to CBCF in Cleveland where he could engage in programming, and that his children could visit. The jail medical unit arrived and the hearing ended.

{¶ 36} On July 8, 2022, another hearing was held. Fluker was housed in the psychiatric exclusion jail unit and received medication. Fluker told the trial court that the jail officers had threatened him and were trying to kill him. The trial court informed Fluker that CBCF denied placement due to his mental health issues, but the trial court could inquire again. Fluker was also advised that the Cincinnati Volunteers of America could also provide services and if those options did not work out, prison would be the remaining route. The trial court was not willing to release him into the community unless he had different housing.

{¶ 37} Fluker asked why people wanted him to be incarcerated. Defense counsel responded that it was because his living situation was not appropriate. The trial court clarified:

> That's not the only reason. Your record is terrible. If you really want me to be harsh about it, your record is bad, more than bad, and the facts of this case are disturbing, so I don't think that a straight release into the community is the appropriate thing. If you don't like what I'm doing, your other choice can be prison, but right now I'm willing to give you probation with treatment.

(Tr. 168.)

{¶ 38} The sentencing entry provides in part:

> The court finds that a community control sanction will adequately protect the public and will not demean the seriousness of the offense. It is therefore ordered that the defendant is sentenced to two years of community control on Count 1, Count 2, under the supervision of the

Adult Probation Department's Mental Health/Developmental Disabilities Unit with the following conditions: 1.) defendant to abide by all rules and regulations of the probation department. 2.) report as directed by probation officer. 3.) follow recommendations of treatment team. 4.) attend all mental health appointments as scheduled. 5.) take all medication as prescribed. 6.) attend programming as indicated in case plan. 7.) defendant is ordered to pay a monthly supervision fee of $20. 8.) random drug testing. 9.) conditions and terms of probation are subject to modification by the probation officer and approval of the court. * * *

Defendant is not to live with Belinda upon release from CBCF. Probation ordered to find housing for defendant upon release from CBCF and court must approve of defendant's housing.

Journal entry No. 124355986, p. 1, 2 (June 1, 2022).

{¶ 39} Fluker appeals.

## II. Assignments of Error

{¶ 40} Fluker presents three assignments of error:

I. The trial court erred in denying appellant's motion for acquittal pursuant to Crim.R. 29 when the state failed to submit sufficient evidence of the crimes charged, denying the appellant due process.

II. Appellant's convictions are against the manifest weight of the evidence.

III. The trial court erred by imposing community control sanctions which unnecessarily impinged on appellant's liberty.

## III. Discussion

### A. Sufficiency and Manifest Weight

### 1. Standard of Review

{¶ 41} "Because a Crim.R. 29 motion for acquittal questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th

Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 42} "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id*. at ¶ 38, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency is a test of adequacy." *Id*. "We construe the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt." *Id*., citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 43} While sufficiency tests the adequacy of the evidence to support the verdict as a matter of law, a manifest weight inquiry asks whose evidence is more persuasive at inducing belief, "the state's or the defendant's?" *State v. Ryan*, 8th Dist. Cuyahoga No. 108143, 2019-Ohio-5339, ¶ 21, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence." *Id*., citing *Thompkins* at 387; *State v. Johnson,* 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000).

{¶ 44} We also recognize that the trial court and not a jury is serving as the factfinder in our manifest-weight review of a bench trial verdict.

> "Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest

miscarriage of justice that the judgment must be reversed, and a new trial ordered."

*State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 25 (8th Dist.), quoting *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125 (8th Dist.), citing *Thompkins* at 390. *See also State v. Kessler*, 8th Dist. Cuyahoga No. 93340, 2010-Ohio-2094, ¶ 13. Only in the most "'exceptional cases in which the evidence weighs heavily against the conviction, should a conviction be reversed as against the manifest weight of the evidence.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 2. Analysis

{¶ 45} Fluker argues that not only is the evidence insufficient to support the elements of the convictions, but the evidence is not competent and credible. We disagree.

{¶ 46} Fluker was convicted of two counts of menacing by stalking under R.C. 2903.211(A)(1) which provides in pertinent part:

> (1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

"'Pattern of conduct' means two or more actions or incidents closely related in time." R.C. 2903.211(D)(1). The second count adds that Fluker trespassed on the land or premises where the victim lives, is employed, or attends school to commit the act.

{¶ 47} R.C. 2903.211(D)(2) defines "mental distress" to mean any of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶ 48} R.C. 2903.211(D)(11) defines a "family or house hold member" as any of the following:

(a) Any of the following who is residing or has resided with the person against whom the act prohibited in division (A)(1) of this section is committed: * * *

(ii) A parent, a foster parent, or a child of the person, or another person related by consanguinity or affinity to the person.

{¶ 49} R.C. 2901.22(B) defines "knowingly":

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist.

{¶ 50} In a bench trial under Ohio law, "the trial court is entitled to the presumption of regularity, that is, the trial court is presumed to know and follow the law in arriving at its judgment unless it affirmatively appears to the contrary." *State v. Shropshire*, 8th Dist. Cuyahoga No. 103808, 2016-Ohio-7224, ¶ 37, citing *State v. Eley*, 77 Ohio St.3d 174, 180, 672 N.E.2d 640 (1996), citing *State v. Post*, 32 Ohio St.3d 380, 513 N.E.2d 754 (1987). "[I]n an appeal from a bench trial, we

presume that a trial court relies only on relevant, material, and competent evidence in arriving at its judgment." *Id.*, citing *id.* at 180.

{¶ 51} Mother provided testimony as well as exhibits of the threatening text messages that contained threats to the safety of Mother and her family. Police testified that Doe confirmed the source of the texts. Mother also testified that she observed Fluker driving by the house to photograph the family. Both Mother and Fluker testified that Fluker went to Mother's house and spoke with Mother on or about September 12, 2021, though their descriptions of the interaction differed.

{¶ 52} The testimony and evidence further support that a first-floor window had been broken and that Mother saw a tall male whom she later determined was Fluker running from the house. Just a few days after the broken window and later on the day that Fluker visited Mother, a bullet was fired into the house. Fluker testified on his behalf, denied the allegations, and provided his explanation of the events.

{¶ 53} This court finds that, if believed, the evidence and testimony submitted to the trial court would convince the average mind of Fluker's guilt beyond a reasonable doubt. Thus, we conclude that there was sufficient evidence to convict Fluker of menacing by stalking.

{¶ 54} As to the manifest weight of the evidence, "[d]eterminations of credibility and weight of the testimony remain within the province of the trier of fact." *State v. Newman*, 8th Dist. Cuyahoga No. 109182, 2020-Ohio-5087, ¶ 27, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of

the syllabus. "[T]he factfinder may take note of the inconsistencies and resolve them accordingly, 'believ[ing] all, part or none of a witness's testimony.'" *Id.*, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). Coupled with the bench trial presumption that the trial court knows and follows the law, this court finds that the record does not support that this is the exceptional case where the evidence weighs heavily against conviction.

{¶ 55} The first and second assignments of error are overruled.

**B. Community Control Sanctions**

**1. Standard of review**

{¶ 56} An appellate court reviews a trial court's imposition of community-control sanctions for an abuse of discretion. *State v. Cintron*, 8th Dist. Cuyahoga No. 110600, 2022-Ohio-305, ¶ 18, citing *State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 10. An "abuse of discretion" occurs where "a court exercise[s] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

{¶ 57} "[A] court will not be found to have abused its discretion in fashioning a community-control sanction as long as the condition is reasonably related to the probationary goals of doing justice, rehabilitating the offender, and insuring good behavior." *State v. Chapman*, 163 Ohio St.3d 290, 2020-Ohio-6730, 170 N.E.3d 6, ¶ 8, citing *State v. Talty*, 103 Ohio St. 3d 177, 2004-Ohio-4888, 814 N.E.2d 1201,

¶ 12. "Further, a condition "'cannot be overly broad so as to unnecessarily impinge upon the probationer's liberty.""" *Id.*, quoting *id.* at ¶ 13, quoting *State v. Jones*, 49 Ohio St.3d 51, 52, 550 N.E.2d 469 (1990).

## 2. Analysis

{¶ 58} "R.C. 2929.15(A)(1) governs the authority of the trial court to impose conditions of community control." *Talty* at ¶ 10. The section provides that "the trial court may impose one or more community sanctions, including residential, nonresidential, and financial sanctions, and any other conditions that it considers 'appropriate'." *Id.* "The General Assembly has thus granted broad discretion to trial courts in imposing community-control sanctions." *Id.*

{¶ 59} The trial court informed Fluker that the options were CBCF, a similar facility or prison and cited, among other factors, its disapproval of Fluker's relationship with then 19-year-old and expectant Doe, who resided at Massey's home. The sentencing entry does not specifically forbid the relationship or ban contact with Doe, but states that Fluker is not to return to Massey's home upon release from CBCF. The entry also provided that the probation department is to find housing for Fluker upon release and the trial court must approve the housing.

{¶ 60} Fluker argues that the trial court improperly restricted Fluker from continuing his relationship with a female over the age of 18 and does not meet the test set forth in *Jones*, 49 Ohio St.3d at 52-53, 550 N.E.2d 469. The restriction, states Fluker, impinges on his constitutional liberty interests.

{¶ 61} "[A] trial court can impose community-control sanctions that limit the offender's fundamental rights, provided that such limitations further the statutory goals of community control and are not overbroad." *State v. Chapman*, 163 Ohio St.3d 290, 2020-Ohio-6730, 170 N.E.3d 6, ¶ 16. This is true "because convicted criminals serving their sentences enjoy diminished liberty interests when compared with the general population." *Id.*

{¶ 62} *Chapman* declared that the three-part test in *Jones* applies to determine whether the condition is reasonably related to the community control goals.

> A court must "consider whether the condition (1) is reasonably related to rehabilitating the offender, (2) has some relationship to the crime of which the offender was convicted, and (3) relates to conduct which is criminal or reasonably related to future criminality and serves the statutory ends of probation." *Jones*, 49 Ohio St.3d at 53, 550 N.E.2d 469.

*Chapman* at ¶ 23.

{¶ 63} Fluker's sole focus on the trial court's somewhat strenuous objection to Fluker's relationship with Doe is misplaced because the trial court's sentence and substantiation therefor must be considered *in toto*. The trial court explained that what Fluker "really needs [is] programming on boundaries and decision-making and appropriate relationships." (Tr. 146.) "You don't know boundaries. Do you know what boundaries are? If you don't know when to stop your behavior. Your record is all about that. Your record is all about you not knowing what the boundaries are in personal relationships." (Tr. 145.) The trial court did not order

that Fluker have no contact with Doe but crafted a sentence that would allow him to receive proper medication and counseling, assist him with decision-making and help him to maintain appropriate boundaries while honing coping skills. The trial court was also concerned with Fluker's criminal history of violating protection orders, domestic violence, and telecommunications harassment over the prior ten years.

{¶ 64} The record supports that the sentence meets the *Jones* elements. CBCF was a reasonable alternative to imprisonment under the circumstances. Fluker's case was placed on the mental health docket due to his challenges. The trial court formulated a sentence that would allow Fluker to receive the counseling and medication that he needed to assist him with making reasonable decisions. The trial court also directed that Fluker's CBCF placement be supervised by the mental health and development disabilities unit of the adult probation department. In crafting the sentence, the trial court took into consideration Fluker's history of similar criminal behavior. Thus, CBCF placement allowed Fluker to receive counseling for behavioral modification.

{¶ 65} The trial court also explained to Fluker that in addition to his poor reasoning:

> Your record is terrible. If you really want me to be harsh about it, your record is bad, more than bad, and the facts of this case are disturbing, so I don't think that a straight release into the community is the appropriate thing. If you don't like what I'm doing, your other choice can be prison, but right now I'm willing to give you probation with treatment.

(Tr. 168.)

{¶ 66} The record supports that the trial court worked within its discretion to craft a sentence that was reasonably related to Fluker's convictions. This court does not find that the nonstandard community-control conditions in this case impinges on Fluker's liberty interests. The trial court opined that Fluker should not be directly released into the community without boundaries and counseling. We reiterate that the trial court did not bar Fluker from contact with Doe. To the extent Fluker complains that the condition that he not return to Belinda Massey's home, is not necessarily intrinsic to community control, that condition and the others "are tailored to the rehabilitation of the offender," and "are appropriately crafted to meet a proper rehabilitative purpose." *Chapman*, 163 Ohio St.3d 290, 2020-Ohio-6730, 170 N.E.3d 6, ¶ 18, 19.

{¶ 67} The third assignment of error lacks merit.

## IV. Conclusion

{¶ 68} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, ADMINISTRATIVE JUDGE

MICHELLE J. SHEEHAN, J., and
EILEEN T. GALLAGHER, J., CONCUR